638 F.2d 804
 William R. COLE, Plaintiff-Appellee-Cross Appellant,
v.
Henry B. GRAY, III, Etc. et al., Defendants-Cross Appellees.
Fred R. Jones, Individually and as State Senator and Alvin
Holmes, Etc., Defendants-Appellants-Cross Appellees.
 No. 79-1692.
 United States Court of Appeals,
Fifth Circuit.
 March 2, 1981.
 
 Albert W. Copeland, William B. Moore, Jr., Charles A. Graddick, Atty. Gen. of Ala., Sarah M. Greenhaw, Asst. Atty. Gen., Robert D. Segall, Montgomery, Ala., for defendants-appellants-cross appellees.
 Alvin T. Prestwood, Claude P. Rosser, Jr., Montgomery, Ala., W. Michael Young, Cullman, Ala., for William R. Cole.
 John Matthews, Deputy Asst. Judge Advocate, Litigation Div., Dept. of Army, Washington, D. C., Charles M. Crook, Montgomery, Ala., for Henry B. Gray, III, et al.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before VANCE and GARZA, Circuit Judges and ALLGOOD,* District Judge.
 GARZA, Circuit Judge:
 
 
 1
 This litigation arises from a series of state and federal investigations of wrongdoing by personnel within the Military Department of the State of Alabama. Among the subjects of inquiry was plaintiff-appellant William Cole, a colonel in the Alabama Army National Guard and chief of one of the military department's divisions. After the investigatory dust had settled, Cole brought this suit against a state senator and state representative who had participated in a legislative survey of the allegations, the adjutant-general of the military department who had dismissed him from his position, and a major in the United States Army who was dispatched to pursue an independent federal inspection.
 
 
 2
 Cole asserted that the defendants by their conduct with regard to these investigations had wrongfully deprived him of his good name, his right of free speech, and certain property rights related to his guard status, within the cognizance of 42 U.S.C. §§ 1983 and 1985. The defendants interposed various defenses of immunity by motions for summary judgment. The district court granted the motions of the "executive defendants," but denied those of the legislators.
 
 
 3
 Cole now appeals from the summary judgment granted the executive defendants, and we have authorized an interlocutory appeal by the legislative defendants from the denial of their motions. For the reasons stated below, we conclude that the judgment of the district court must be affirmed where the motions were granted and reversed where they were denied.
 
 I.
 
 4
 William Cole was for many years a non-probationary employee of the military department, and a federally recognized colonel in the Alabama national guard. He held the permanent merit system classification of Military Executive Officer, and served as chief of the Personnel and Administrative Division of the military department.
 
 
 5
 During the time that Cole held the latter position, the compulsory military draft was terminated. As a consequence, federal funds were made available for "recruitment and retention." It is apparent that Cole and other officers were compensated from these funds for time spent in performing recruitment and retention functions. It was not the disbursement of the funds which caused controversy, but the amounts paid out.
 
 
 6
 In October of 1975, the Alabama legislature passed a resolution creating a joint interim committee to investigate the use of federal funds in the state. The resolution was introduced by State Senator Fred R. Jones. The resulting committee consisted of three Senators, including Jones, and three representatives, including Alvin Holmes.
 
 
 7
 Holmes moved that the committee look into affairs in the military department. Senator Jones had been connected with the department in the past, having been named assistant adjutant-general and nominated for the rank of brigadier general by the governor. Time-in-service requirements prevented federal recognition of such a rank. Jones offered to abstain from participation in the investigation of the military department, but the committee refused to accept his move. When hearings on the matter began, therefore, he was an active participant.
 
 
 8
 The hearings were open to the public and were widely reported by the news media. The committee discovered that high-ranking officers in the department had been paid for a substantial number of extra duty days. In 1975, for example, the following officers received, in addition to their salaries and approximately 48 days of "drill pay," payment for extra duty as shown below:
 
 General Rollo
 
 9
 (then adj. gen.) 171 extra duty days
 
 Colonel Speigner 136 extra duty days
 Major Hawthorn 179 extra duty days
 Colonel Hora 129 extra duty days
 Colonel Cole 166 extra duty days
 
 10
 During the hearings, Jones stated that funds were "squandered," and Holmes asserted that Cole did not work on all of the days for which he received pay.
 
 
 11
 As we have noted, the Interim Committee investigation spawned parallel inquiries. Adjutant-General Rollo asked the Commanding General of the First Army to conduct an investigation. Pursuant to this request, Major Francis Cummings was sent to Alabama to prepare a report of inquiry, arriving in March of 1976. He was contacted by Senator Jones immediately on arrival, and met with him on several occasions to discuss the charges. At one point, Jones asked him to contact the United States Attorney about the matter.
 
 
 12
 As a result of disclosures at the committee hearings, Governor Wallace acted in May to prohibit officers from receiving extra-duty pay in the absence of written authorization from his office. The interim committee was dissolved by the expiration of its legislative mandate on June 3rd.
 
 
 13
 Major Cummings' report was filed on September 14th. It levelled two basic charges against Cole: (1) that he excessively used man-days, receiving pay for work that was apparently not necessary, and (2) that he participated in defrauding the federal government out of hundreds of thousands of dollars annually in the method of issuing orders in the Alabama military department. The report was released to the public in March of 1977 at the governor's request, and Adjutant-General Rollo resigned his post. General Henry Gray was appointed to succeed him, taking office with instructions to "clean up the mess."
 
 
 14
 General Gray contacted Senator Jones and apparently discussed the Military Department problems with him in detail. He later testified that while he was considering an appropriate course of action, he "had a great deal of information from ... Senator Jones concerning the legislative subcommittee investigation into the Guard." Gray suspended Cole, and on April 20, 1977, the Colonel received a letter signed by the new Adjutant-General which dismissed him from his non-probationary merit system position. Gray forwarded to the first army a request that Cole be stripped of his federal recognition as a colonel in the national guard.
 
 
 15
 Cole appealed his dismissal to the Alabama Personnel Board, which ordered him reinstated. The board was, nonetheless, highly critical of the practices which led to the discharge and denied thirty-three days of salary. Gray publicly commented that the occasion was "a sad day for honesty and integrity in government," and reduced Cole's responsibilities to those of a branch chief within the plans, operations, and training division of the military department. The recommendation that federal recognition of Cole's rank be withdrawn was dropped at the governor's request.
 
 
 16
 When the news of the Personnel Board's decision was prematurely "leaked," Representative Holmes contacted the State Personnel Director and asked if he could reappear before the board. At a public press conference, he stated his opposition to the reinstatement and called Cole the "most notorious racist out there." After Gray withdrew his request that federal recognition of Cole's rank be terminated, Holmes was quoted by the press as saying that Cole and other officers were "some of the most corrupt individuals ... who have ever served in public office," and that "Wallace says he's for law and order, but he's not for putting white collar criminals behind bars." Holmes expressed surprise that Cole and other officers had not been indicted by a federal grand jury.
 
 II.
 
 17
 Cole filed suit on March 20, 1978, against Jones, Holmes, Gray and Cummings. The thrust of his position was that the defendants had engaged in a campaign of harassment and revenge, seeking to oust him from his position and to punish him for activities which he claimed were necessary, proper, and successful.
 
 
 18
 Cole's advocacy of a strong guard as an integral component of the national defense was said to have partially formed the basis of personal and political animosities underlying this "campaign." With regard to Senator Jones, Cole contended that the denial of federal recognition for a brigadier generalship had triggered a crusade of retribution.
 
 
 19
 Cole asserted that when the senator was informed that his generalship would not be forthcoming, he introduced the resolution creating the joint interim committee, knowing that Cole had been responsible for contacting the National Guard Bureau on federal recognition matters. Code has further maintained that Jones told him previously, "If you f * * * with my promotion papers, I will spend the rest of my life f * * * ing you." It was emphasized that Jones' activities continued after the dissolution of the interim committee.
 
 
 20
 Holmes was accused of having acted along with Jones in creating the interim committee, "to examine and falsely criticize the plaintiff in the conduct of his employment." Also noted were Holmes' contacts with Major Cummings, his efforts to have the Personnel Board's decision overturned, and his comments following Cole's reinstatement.
 
 
 21
 Cole has asserted that Major Cummings "possessed an attitude that Alabama had too many people in the National Guard and that potential economic benefits should not be used to encourage recruiting and retention," and that he was thus "fully receptive to the allegations of wrongdoing which were supplied to him by then-senator Jones." In his complaint, Cole accused Cummings of acting in concert with Jones and Holmes to generate and submit false information. It was particularly alleged that Cummings failed to conduct his investigation in accordance with "regulations and law," in that he refused "to properly advise the Plaintiff that he would be the subject of adverse comments in the report."
 
 
 22
 General Gray was accused of conspiring with Jones and others to deprive Cole of his merit system position. It was alleged that Gray acted upon information which he knew to be false, and that after reinstatement had been ordered, he "persisted to defame and stigmatize the plaintiff by publicly accusing him of dishonesty..."
 
 
 23
 The defendants were said to have conspired and acted in concert to deprive Cole of rights secured by the Constitution, and were accused of attempting to achieve his dismissal through false accusations. Jones, Holmes and Gray were said to have acted under color of state law in their official capacities, while Cummings was said to have acted in his capacity as a federal officer, but in concert with the other defendants who acted under color of state law. The specific injuries were said to have been severe damage to Cole's reputation, the temporary loss of his merit system position, and the unwarranted initiation of proceedings to withdraw federal recognition of his rank. Cole sought four million dollars in damages and an injunction against further "harassment."
 
 III.
 
 24
 Each defendant filed a motion for summary judgment. On December 11, 1978, the district court entered an order granting the motions of Gray and Cummings, and denying those of Jones and Holmes. The court found sufficient evidence to create "an issue of fact as to whether the alleged conspiracy existed and whether the defendants were parties thereto."
 
 
 25
 Noting that "all defendants were public officials," the court based its distinction between the executive and legislative defendants upon an analysis of the various claims of official immunity. It was held (1) that all defendants were not responsible for damages "caused by their attending to their official functions within their constitutional authority;" (2) that Gray and Cummings, as military officers directly concerned with the investigation and remedial measures pursuant thereto, had "an official duty to determine whether or not (Cole) should be discharged or whether or not (he) should be recommended for stripping of (his) federal rank;" (3) that they acted constitutionally within the scope of official duty, being thus immune from suit; (4) and that Jones and Holmes, as state legislators, possessed an immunity from suit "if (they) were doing an act delegated by law to the legislative branch," but no immunity for the "improper dissemination of defamatory information outside of the legislative process." Further finding that "(R)emarks, calculated to cause discharge or demotion of a public employee, which are made on radio, television or in private communications by a legislative officer, while the legislature is not considering the questions involved, are not made within the scope of legislative authority," and that "there is no undenied evidence before this court that any distribution of information by defendants Jones and Holmes after termination of the legislative investigation of the Alabama National Guard was essential for the conduct of the public business of legislating," the court determined that their motion for summary judgment should be denied.
 
 IV.
 
 26
 On this appeal, Cole contends that the district court erred in finding Gray and Cummings to have been protected by an official immunity. The legislative defendants argue that the trial court erred in finding them unprotected, and that in any event, summary judgment in their favor was required because Cole failed to raise a fact issue with regard to their alleged conspiratorial participation. We will first discuss the controversy related to the executive defendants.
 
 
 27
 Both Gray and Cummings assert that on the facts of this case their actions were shielded by the absolute official immunity described in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and if we should find to the contrary, that they were clearly within the parameters of the qualified immunity discussed in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).
 
 
 28
 The district court found that Gray acted within the scope of his authority, and pursuant to a specifically assigned duty to investigate the charges against his officers. It further found that he acted with a reasonable belief, in good faith, that his actions were proper.
 
 
 29
 Viewing the evidence in the light most favorable to Cole's position, we hold Gray to come within the range of the qualified Scheuer immunity. Gray was specifically charged by the governor with investigating the charges. He did exactly that, concluding that the actions complained of were abuses of sufficient magnitude to warrant discharge. That the State Personnel Board later disagreed with the sanction imposed does not obviate a conclusion that Gray acted in good faith.
 
 
 30
 We note that the interim committee investigation was completed months before Gray took office. Cummings completed his role before the appointment, and Gray never met him. The only allegation bearing the slightest potential damage to Gray's claim of good faith was that of his attendance at a luncheon meeting with Jones before the discharge. Cole asserts that as this meeting took place on April 24th and he was suspended by Gray on the 25th, he must have been the subject of the conversation. That amounts, of course, to mere speculation. Gray testified that he wanted general information and did not discuss specifics with regard to any individual.
 
 
 31
 The evidence does not support any theory that Gray was party to a scheme to railroad Cole out of office, or even that he was unfairly receptive to Jones' view of the charges. There is certainly no showing beyond mere allegation that Gray knowingly received and acted on false information. The evidence tends to show instead that Gray was simply attempting to compile a broad body of information upon which the decision officially entrusted to him could be made. It would have been strange indeed to avoid consultation with the legislators who spearheaded a previous committee investigation. Gray then acted pursuant to his authority under Section 36-26-27, Code of Alabama, 1975, and Section 2 of Rule XIII of the rules of the State Personnel Board by instituting proceedings to terminate Cole's employment with the State of Alabama, advising him that he could within ten days request an investigation by the State Personnel Board. In requesting that Cole's federal recognition be withdrawn, Gray acted within the authority imposed upon him by National Guard Regulation 635-101.
 
 In Scheuer, the Supreme Court noted:
 
 32
 It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with a good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. 416 U.S. 232 at 247, 94 S.Ct. 1683 at 1692, 40 L.Ed.2d 90 at 103.
 
 
 33
 It is manifestly apparent that Gray is protected by this concept.
 
 
 34
 With regard to Cummings, the court found both investigation and report to have been conducted according to orders and within the scope of official authority. We find no evidence to even hint at an opposite conclusion. It is manifestly apparent that his actions were taken in good faith, within the scope of his discretion and the responsibilities of his office. The district court noted that "Cummings reported the good and the bad about Colonel Cole and made no recommendation that Cole be disciplined while recommending discipline for several other officers who apparently were more involved than Cole." Cummings' actions were clearly within the range of the Scheuer immunity, and the district court was eminently correct in granting summary judgment for him.
 
 
 35
 We are thus in agreement with the disposition of this suit as to the executive defendants. We do not indicate approval or disapproval of their actions, but simply find them to have been within the potentially protected realm of official capacity, free of the corrosive effects of bad faith. Those few shreds of evidence which are said to indicate bad faith, such as contact with Jones and Holmes, show no more than an inattention to the political nuances of outward appearance.
 
 
 36
 The legislative defendants do not have such smooth sailing on their claims to immunity. Both argued below that their public and private statements concerning Cole were immunized from suit by the Speech and Debate Clause, U.S.Const. Art. I, § 6, Cl. 1. The district court apparently accepted the potential applicability of such a privilege to them, for it cited Hutchinson v. Proxmire, 579 F.2d 1027 (7 Cir. 1978), rev'd. 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), for the proposition that "immunity does not attach to the improper dissemination of defamatory information outside of the legislative process." Accordingly, statements and activities occurring after the dissolution of the committee were held unprotected.
 
 
 37
 We find reliance on the Speech or Debate Clause to be misplaced. Hutchinson v. Proxmire involved a United States senator, not a state legislator. By its recent decision in United States v. Gillock, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), the Supreme Court has unequivocally ruled that the embrace of the clause does not extend to a state legislator. The Court reaffirmed, however, its holding in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that members of a state legislature are potentially immune from suits for the alleged violation of civil rights under §§ 1983 and 1985, on the theory that a common law absolute immunity from suit survived the passage of the Civil Rights Act of 1871.
 
 
 38
 The Tenney immunity is only absolute within its scope, however, and coverage of Jones and Holmes is limited by the same considerations articulated in Hutchinson. It extends only to acts done "within the sphere of legitimate legislative activity." Tenney, 341 U.S. 367 at 376, 71 S.Ct. 783 at 788, 95 L.Ed. 1019 at 1027. In Tenney, the Court rejected an argument that the California senate's fact-finding committee on un-American activities had exceeded this scope: "to find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the judiciary or the executive." 341 U.S. 367 at 378, 71 S.Ct. 783 at 789, 95 L.Ed. 1019 at 1028.
 
 
 39
 Thus, we must conclude that the actions of Jones and Holmes taken during the pendency of the committee were protected by this rationale. We find those actions and statements occurring after the committee dissolved to be outside its coverage. After the specific investigatory mandate expired, the reasoning of Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972) becomes applicable by analogy: "(M)embers of Congress are constantly in touch with the executive branch of the government and with administrative agencies.... They may cajole and exhort with respect to the administration of a federal statute but such conduct, though generally done, is not protected legislative activity." 408 U.S. 606 at 625, 92 S.Ct. 2614 at 2627, 33 L.Ed.2d 583 at 602.
 
 
 40
 As best we can construe them, Cole's allegations as to the defendants' actions after the committee's dissolution are (1) that by their comments, they defamed Cole and deprived him of his good name, and (2) that in conspiracy with Gray and Cummings, they acted to deprive him of his position without due process of law, effecting a denial of equal protection.
 
 
 41
 Insofar as the complaint alleged an injury by defamation alone, referring to negative public statements made by the defendants, the district court was correct in finding no cause of action under the Civil Rights Acts. The Supreme Court established in Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) that the loss of a good name, as destroyed by defamation on the part of a public official, is not a "liberty or property interest" for which these statutes provide protection.
 
 
 42
 We are left with the portion of the complaint alleging a conspiracy to deprive Cole of his position. The complaint was cast in terms of conspiracy by necessity, as under § 1985, a finding of conspiracy is legally required, and under § 1983, the circumstances of this case render it factually required; Gray did the firing, so Jones and Holmes can only have participated by conspiracy with him.
 
 
 43
 As we noted in discussing Gray's claim to immunity, the evidence does not nearly support a theory of conspiracy between Gray and the legislative defendants. Cole has shown a possible motive of personal animosity on the part of Jones, but there is not an iota of substantiation for his allegation that he was fired in retaliation for utterances protected by the First Amendment. He has shown minimal contact between the executive and legislative defendants, with no buttressing proof of the actual nature of the information conveyed. No proof of the making or accepting of statements known to be false exists in the record. Finally, there is the discharge itself. These elements, murky allegations as to motive plus mere contact plus the fact of discharge are linked together by speculation and conclusory allegations. The evidence was wholly insufficient to raise a fact issue for trial on the conspiracy complaint.
 
 
 44
 There is nothing left of Colonel Cole's complaints. We close with the observation that the Civil Rights Acts on which this suit was predicated do not make the federal district court a forum for the litigation of every controversy surrounding the loss of property interests through state action. In this instance, the political and governmental processes involved worked to investigate and resolve the allegations against Cole and, after the prescribed procedures had run their course, to restore him to his position. There is no reason and no room for involvement on the part of a federal court.
 
 
 45
 For these reasons, that portion of the judgment of the district court dismissing the claim against Gray and Cummings is AFFIRMED, and that portion related to Jones and Holmes is REVERSED and REMANDED with instructions that the remainder of the complaint be dismissed.
 
 
 
 *
 District Judge of the Northern District of Alabama sitting by designation