**Diana Christine DYKES, Plaintiff,**

v.

**Thomas A. WEINBERG, et al., Defendants.**

**No. 79–471–Orl–Civ–Y.**

United States District Court,
M.D. Florida,
Orlando Division.

April 15, 1983.

Francis B. Burch, J. Edward Davis, and J. Calvin Jenkins, Jr., Baltimore, Md., for plaintiff Diana Dykes.

Hugh Carithers, Jr., James A. Edwards, and E. Thom Rumberger, Orlando, Fla., for defendants.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Senior District Judge.

This cause is before the Court on the motions of the defendants, Roger Francis Dykes, Sr., Roger Francis Dykes, Jr., and Thomas A. Weinberg, for summary judgment. In an order entered January 8, 1982, the claim of plaintiff Aaron Matthew Dykes was dismissed with prejudice and the ruling on defendants' motions for summary judgment as to the claim of Diana Christine Dykes was stayed pending the Court's re-

view of the depositions filed in this case. After a review of the depositions the Court requested E. Thom Rumberger, attorney for defendants Dykes, Sr. and Dykes, Jr., to furnish a copy of the state court files of the custody proceedings in *Dykes v. Dykes,* including the appellate files. This request was honored and the files have been reviewed and considered by this Court.

The following material facts are undisputed:

### I.

Diana Dykes and Roger Francis Dykes, Jr. ("Buzzy") were married in Phoenix, Maryland on June 30, 1973, and lived in Florida for the first two years of their marriage. Their son, Aaron, was born on November 18, 1974. In December of 1975, the Dykes moved to Maryland and then in June of 1976, to Pennsylvania. While they were living in Pennsylvania, Diana had a part-time job and Buzzy was attending college.

In 1977, the couple were having marital problems and had been seeing a counselor. Buzzy believed that Diana was seeing another man. Diana denies any wrongdoing but admits that this was a bone of contention. They also argued frequently about Buzzy's progress in college and his poor grades.

Before Thanksgiving of 1977, Buzzy decided to withdraw from school and go to stay with his father, Judge Dykes,[1] in Brevard County. Buzzy informed Diana that he was going to take Aaron with him to his father's home and asked Diana to accompany them. Diana helped them pack but decided to remain in Pennsylvania. Diana was unhappy because Buzzy and Aaron left on November 15th, just three days before Aaron's third birthday and Aaron missed the party she had planned.

Buzzy's parents had been concerned for some time about the couple's marital difficulties. When Judge Dykes called Pennsylvania the night of November 15th, Diana advised him that Buzzy and Aaron were on

---

[1] A State of Florida Circuit Judge (a trial judge of general jurisdiction).

their way down to Florida. Diana spoke with Buzzy over the telephone on the 17th, the day they arrived in Florida. Buzzy's parents were upset about Buzzy's separation from Diana. Buzzy and his parents were all concerned that Diana would try to come and take Aaron back with her, a fear which was later proven to be correct. Buzzy was determined to take some kind of action to protect Aaron from being abducted and discussed the problem with his father.

Judge Dykes called the Juvenile Court to familiarize himself with the proceedings which could give Buzzy temporary custody of Aaron. Judge Hosemann, the Juvenile Judge, told Judge Dykes that a dependency petition [2] was usually handled through an intake officer at Health and Rehabilitative Services (HRS). Judge Dykes accompanied Buzzy to the neighborhood HRS office early in the evening on November 21st. There they met with Mr. Kendrick Lofback. Buzzy explained that he feared for Aaron's safety, and asked if there was anything that HRS could do to assist him. Mr. Lofback called his supervisor, Mr. Thomas Weinberg, to find out exactly how to proceed with Buzzy's request. Both Mr. Weinberg and Mr. Lofback felt that this was not an appropriate petition for the agency to file. Mr. Lofback suggested that he could help Buzzy write the petition and Buzzy could then file it in his own name. Mr. Weinberg agreed that the HRS could at least assist in filling out the petition since Buzzy appeared to have legitimate concern for Aaron's welfare.

The next morning Mr. Weinberg took the petition to the police station which was being used as the courthouse while the new courthouse was under construction. Buzzy met him there and signed the petition. Mr. Weinberg then accompanied Buzzy in presenting the petition to Judge Hosemann in chambers. Judge Hosemann testified that it was customary for him to receive dependency petitions in chambers. After reading the petition, Judge Hosemann issued an order adjudicating Aaron to be a dependent child and giving temporary care, custody and control to Buzzy. Diana was not served with notice of the dependency petition and had no opportunity to appear before the order was issued.

Buzzy called Diana a day or so later and informed her that he had a court order that Aaron could not be taken out of Florida. Although Diana contends that she never received official notice and did not learn of the contents of the order until January 30, 1978, she admits that Buzzy told her during that telephone conversation that an order had been granted.

Plaintiff claims that Judge Hosemann had no subject matter jurisdiction to grant the order since Aaron was not a "dependent" or "delinquent" within the meaning of Chapter 31, Florida Statutes. Whether in fact the order was subject to reversal does not obviate the fact that Judge Hosemann, who entered the order, was sitting as a juvenile judge and it was a case presented to him within his jurisdiction.

Shortly after entry of the order, Diana and Buzzy closed up their Maryland apartment and Diana came back with Buzzy to Florida. They first stayed in Judge Dykes' home with the judge and his second wife (Buzzy's stepmother). Later they moved in with Buzzy's mother, Marilu.[3]

Diana stayed in Florida until the end of January 1978, when she decided to take Aaron with her to her parents' home in Maryland. Diana told no one she was leaving because she was afraid that someone in Buzzy's family would try to stop her. Instead, she left a note for Marilu telling her that they had gone to the beach and then Diana and Aaron flew to Maryland and went to stay with Diana's parents.

---

**2.** In 1977 this procedure was established by Section 39.05 Florida Statutes. In 1978 the Florida State Legislature revised Chapter 39 and it became known as the "Florida Juvenile Justice Act", with new sections effective October 1, 1978. The procedure for filing a depend-ency petition is now established by Section 39.404, Florida Statutes.

**3.** The first Mrs. Dykes, who was divorced from Judge Dykes.

After Diana left, Judge Dykes accompanied Buzzy to the Juvenile Court office to try to locate Mr. Weinberg. Buzzy was hopeful that Mr. Weinberg could help in contacting the Maryland authorities handling custody matters and could enlist their help to locate Aaron. Apparently Judge Dykes, Buzzy, Tom Weinberg, Michael Dea, another HRS employee, and Judge Hosemann met in Judge Hosemann's chambers and discussed the possibility of getting Aaron returned to Florida. Of the five, Judge Hosemann was the only one who did not recall that the meeting took place.

On January 27, 1978, in connection with a petition filed by Buzzy for dissolution of marriage, State of Florida Circuit Judge Muldrew issued an order giving temporary custody to Buzzy and directed Diana to turn over custody of Aaron to Buzzy. Diana also filed a complaint in Maryland seeking custody and alimony. On January 30, Buzzy obtained a custody order from the Maryland Circuit Court in Baltimore. That night Buzzy and several other individuals served Diana with the petition for dissolution of marriage and the Maryland Circuit Court order. Diana then surrendered custody of Aaron to Buzzy.

Judge Muldrew issued an order on February 22, 1978 which granted further temporary custody of Aaron to Buzzy and ordered that a social investigation be conducted and filed with the court within 60 days. Mary Rodon, the social worker on the case, filed the social investigation with the court in November of 1978, some eight months later. Plaintiff contends that Judge Dykes and others directed Ms. Rodon to delay in finalizing the report in order to work to Diana's detriment in regaining custody.

Ms. Rodon testified that in the majority of her cases a social investigation will take five months, depending on her total caseload and the difficulty in the individual case

of contacting references. She stated that out-of-state cases take longer and it was normal for one to last more than seven months. As was the custom, Ms. Rodon waited for the Maryland and Pennsylvania investigations, which she received in August, before conducting the local investigation. In September, October and November she completed her local interviews, did the home study, ordered Buzzy's psychological examination and ordered Aaron's medical examination. Ms. Rodon's final social report made no custody recommendation, but left that decision up to the judge.

On August 15, 1978, Judge Muldrew issued a final judgment of dissolution of marriage. Then on February 22, 1979, Judge Muldrew entered a final judgment granting permanent custody of Aaron to Buzzy.

## II.

Plaintiff brings this action under 42 U.S.C. § 1983. Action taken "under color of state law" is an essential element of any suit brought under this statute and it is well settled that 42 U.S.C. § 1983 does not reach purely private conduct. *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613, *reh. denied,* 410 U.S. 959, 93 S.Ct. 1411, 35 L.Ed.2d 694 (1973); *Parker v. Graves,* 479 F.2d 335 (5th Cir. 1973).

Apparently plaintiff argues that either defendants' participation in state court litigation and/or what plaintiff claims is Judge Dykes' use of his office to obtain the temporary custody order for Buzzy translate into action under color of state law.

■ The Fifth Circuit has repeatedly held that use of the state's judicial processes by private litigants does not constitute action taken under color of state law: *Dahl v. Akin,* 630 F.2d 277 (5th Cir. 1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1977, 68 L.Ed.2d 296 (1981);[4] *Hill v.*

4. In *Dahl,* a daughter, fearing diversion of her father's estate if he were to remarry, represented to the Texas court, ex parte, that her father was incompetent and succeeded in having herself appointed as guardian. Then, again ex parte, she petitioned the court to issue a writ directing that the father be institutionalized, which the court did. "Thus armed with less process than would be necessary to seize a refrigerator ... Texas peace officers dragged Dahl from his home and deposited him with a Presbyterian hospital in Dallas." *Id.* at 279.

*McClellan,* 490 F.2d 859 (5th Cir.1974); *Henry v. First National Bank of Clarksdale,* 444 F.2d 1300 (5th Cir.1971), *cert. denied,* 405 U.S. 1019, 92 S.Ct. 1284, 31 L.Ed.2d 483, *reh. denied* 406 U.S. 963, 92 S.Ct. 2057, 32 L.Ed.2d 351 (1972). Thus plaintiff's argument that defendants' participation in state court litigation constituted action under color of state law can easily be dismissed.

■ Alternatively, plaintiff contends the requisite element of action under color of state law is present because Judge Dykes and/or Weinberg used their positions to obtain the temporary custody order for his son.

The only documentary evidence which plaintiff has presented in support of her claim concerning Judge Dykes are six pages of Xerox copies of handwritten and typewritten notes which the plaintiff found in a filing cabinet in Buzzy's apartment: It is undisputed that several of the notes are in Judge Dykes' handwriting. One note, marked with the caption "notes made back in Nov.", and written by Judge Dykes is similar in writing to the language contained in the dependency petition which Buzzy filed on November 22, 1977. The other notes apparently were written after January 23, 1978 when Diana returned with Aaron to Maryland and January 30, 1978 when Diana surrendered custody of Aaron to Buzzy since they refer to Buzzy's upcoming trip to Maryland and attorney Ken McIntosh's legal research with regard to the Uniform Child Custody Jurisdiction Act.

At most, these notes show that Judge Dykes was aware of his son's marital problems and knew of the preparations that Buzzy was making for his January 30 trip to Maryland. There is no indication that, as Diana alleges, there was a plan devised by Judge Dykes and Buzzy for Judge Dykes to utilize his position to wrongfully insure Buzzy's custody of Aaron, nor do the notes evidence judicial impropriety or undue influence on the part of Judge Dykes.

The Fifth Circuit held that plaintiff had been deprived of liberty and property without due process but that the daughter's conduct in ini-

A careful reading of the state court proceedings in *Dykes v. Dykes* shows that Diana presented her claim of judicial impropriety and undue influence to the Brevard County Circuit Court, to the Fifth District Court of Appeal, and to the Florida Supreme Court. This is the same issue which she raises now in Federal Court. All the Florida state courts decided the issue adversely to Diana.

The state decisions would seem to put the matter to rest but in the case at bar this Court has gone further in its consideration of plaintiff's claim. A review of all eighteen depositions submitted, totalling over one thousand pages of testimony, does not disclose any judicial impropriety or undue influence on the part of Judge Dykes. Plaintiff has presented no evidence that Judge Dykes used his office or acted in his official capacity to obtain the temporary custody order for his son. It is true that he is a judge, but he is also a father with a natural concern for his son's and grandson's welfare. Judge Dykes had a right to assist Buzzy in ironing out the younger Dykes' marital difficulties so long as he did not assert the influence of his office. Plaintiff contends that the mere fact that Buzzy's father was a judge and Buzzy discussed his problems with him means that there was improper use of his office. If that were true, Judge Dykes could perform no normal functions as a father or citizen without fear of a Section 1983 suit. Clearly, Judge Dykes' actions were not "judicial acts" and the essential element of state action is missing in this Section 1983 suit to the extent such claim rests on the alleged participation of Judge Dykes.

As for defendant Weinberg, plaintiff alleges that he, acting in his official state position as District Intake Supervisor with the Brevard County division of the Florida Department of HRS, deprived plaintiff of procedural and substantive due process and equal protection under the law. During their depositions, both Weinberg and Ken-

tiating court proceedings did not constitute action taken "under color of" state law. *Id.* at 281.

drick Lofback, the Intake Counselor on duty the evening of November 21, 1977, testified that the usual and customary practice at HRS was to assist persons wishing to file dependency petitions when HRS counselors did not feel that there were sufficient grounds for HRS to initiate a petition. An HRS counselor would help in preparing the petition and in presenting the petition to the judge. Plaintiff has presented no evidence to show that the procedure followed in the preparation and presentation of Buzzy's petition was a departure from such routine. On January 26, 1978, during the meeting in Judge Hosemann's chambers, Weinberg and the others present discussed what effect the Uniform Child Custody Act would .have on any attempt of Buzzy to regain custody of Aaron. Weinberg, at Judge Hosemann's request, called Maryland to ask whether that state would honor a Florida custody order. Weinberg states that that was the extent of his involvement with the matter and plaintiff has presented no evidence to the contrary.

The evidence shows that in November of 1977, defendant Weinberg simply assisted Buzzy in preparing and submitting Buzzy's petition, just as Weinberg would have helped any other member of the public. Then in January of 1978, Weinberg performed one of his duties as an employee of HRS by advising Judge Hosemann, a juvenile court judge, on a custody matter.

In his answer defendant Weinberg asserted the affirmative defense of qualified immunity and now raises that defense again in support of his motion for summary judgment. In *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Supreme Court held that a state executive official enjoys a qualified immunity for acts which fall within the scope of that official's discretion and responsibilities. In addition, any claim of qualified immunity must be based on "the existence of reasonable grounds for the belief formed at the time" of the official's act "coupled with good-faith belief" that the act would not result in deprivation of plaintiff's constitutional rights. *Id.* at 247–48, 94 S.Ct. at 1691–92.

Up until last year, an official's "good faith" had to be measured by both an "objective" and a "subjective" standard. In *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court did away with the subjective standard and stated that "good faith" should be measured only by "the objective reasonableness of an official's conduct." *Id.* at ——, 102 S.Ct. at 2739, 73 L.Ed.2d at 410.[5] The Court recognized that use of the subjective "good faith" standard had almost entirely precluded the dismissal of even insubstantial constitutional claims without trial. The Court emphasized that abandonment of the subjective standard will "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.* at ——, 102 S.Ct. at 2739, 73 L.Ed.2d at 410. The Court held that "governmental officials performing discretionary functions" are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*

Defendant Weinberg's responsibilities in the processing of a claim that a child is "dependent" are prescribed by statute. The pertinent portions of Florida Statutes, Chapter 39 provide:[6]

39.04 Intake

(1) Intake shall be performed by the department of health and rehabilitative

---

**5.** Even though *Harlow* involved federal, not state officials, the immunity principles articulated in *Harlow* are equally applicable to the instant case. In *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978) the Supreme Court found that "it would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."

**6.** All references are to sections of Chapter 39 in effect November of 1977 through January of 1978. Pursuant to the "Florida Juvenile Justice Act", effective October 1, 1978, these sections were renumbered as Sections 39.403–39.405.

services. Any complaint that a child is dependent, delinquent, or in need of supervisions shall be made to the intake office operating in the county in which the child is found or in which the case arose. Any person or agency having knowledge of the facts may make a complaint. He shall furnish the intake office facts sufficient to establish the jurisdiction of the court and to support a finding by the court that the child is delinquent, dependent, or in need of supervision. The intake officer shall make a preliminary determination as to whether the facts presented by the complainant are legally sufficient to file a petition, consulting with the state attorney or assistant state attorney where necessary.

.   .   .   .   .

(d) Upon the refusal of the intake officer to file a dependency or need of supervision petition, the complainant shall be advised of his right to file a petition pursuant to § 39.05(2).

39.05 Petition

.   .   .   .   .

(2) All proceedings seeking an adjudication that a child is dependent or in need of supervision shall be initiated by the filing of a petition by the state attorney, an authorized agent of the division of family services, or any other person who has knowledge of the facts alleged or is informed of them and believes that they are true.

39.06 Process and service

.   .   .   .   .

(2) Upon the filing of a petition containing allegations of facts which, if true, would constitute the child therein named a dependent child, or a child in need of supervision, and upon the request of the petitioner, the clerk or deputy clerk shall issue a summons.

.   .   .   .   .

(4) The summons shall be directed to, and shall be served upon, the following persons:

(a) The child, in the same manner as if he were an adult, when the petition alleges delinquency or need of supervision;

(b) The parents; and

(c) The legal custodians, actual custodians, and guardians ad litem, if there be any other than the parents.

.   .   .   .   .

(6) It shall not be necessary to the validity of a proceeding covered by this chapter that the parents or legal custodians be present if their identity or residence is unknown after a diligent search and inquiry have been made, if they are residents of a state other than Florida, or if they evade service or ignore a summons, but in this event the agent of the division of youth services, the agent of the division of family services, or other person who made the search and inquiry shall file in the case a certificate of those facts, and the judge may appoint a guardian ad litem for the child. This subsection shall not apply to a proceeding permanently to commit a child to a licensed child-placing agency or to the division of family services for adoption placement.

Kenneth Lofback, Weinberg's subordinate, refused to file the dependency petition and then, as required by Florida Statutes, § 39.04(1)(d), informed Buzzy and his father that they had a right to file their own dependency petition which Buzzy did. When Lofback called Weinberg at home to ask his advice, Weinberg agreed that Lofback had followed the correct procedures and offered to accompany Buzzy when he filed the petition. Section 39.06(2) clearly states that it is the responsibility of the individual petitioner and not the HRS, when HRS is not the petitioner, to request the clerk of the court to issue a summons to the child's parents. Thus, HRS was under no duty to notify Diana that the petition had been filed. The evidence shows that in November of 1977 Weinberg was fulfilling his duties as Intake supervisor with HRS.

Weinberg, and three other HRS employees, filed affidavits to the effect that in juvenile matters the HRS serves as an arm

of the court and HRS employees have a duty to advise the judge on juvenile cases when the judge asks for assistance. Exhibits A–D, Defendant Weinberg's motion for summary judgment (December 11, 1981). The evidence shows that in January of 1978, Weinberg did no more than call Maryland to inquire whether Maryland would honor Florida child custody orders, all at the request of Judge Hosemann. Once again, Weinberg was performing one of his responsibilities as an HRS employee.

Clearly Weinberg's acts of November 1977 through January of 1978 of which plaintiff complains, fall within Weinberg's official capacity. Thus, under *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), Weinberg is entitled to qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at ——, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. In her lengthy amended complaint plaintiff alleges in only the most general terms why she believes that defendant Weinberg deprived her of procedural and substantive due process and equal protection. The facts show that at all times Weinberg followed the usual and customary procedures of HRS in helping Buzzy file the dependency petition and later in answering Judge Hosemann's questions. This Court finds, after reviewing all the evidence, that the material facts with regard to plaintiff's claim against defendant Weinberg are undisputed that Weinberg reasonably and in good faith, believed that he was not violating any of plaintiff's "clearly established statutory or constitutional rights." Weinberg has shown that he is entitled to the defense of qualified immunity so this Court will grant Weinberg's motion for summary judgment.

Plaintiff's claim against Buzzy apparently is based on plaintiff's allegation that Buzzy and his father, Judge Dykes "formulated a plan" to have custody of Aaron given unlawfully to Buzzy which they successfully carried to completion and the allegation that defendant Weinberg collaborated in this "plan". Obviously, without the alleged involvement of Judge Dykes and/or

Weinberg, plaintiff would have no valid claim under 42 U.S.C. § 1983 because the essential element of state action would be missing.

In an en banc decision in 1979, the Fifth Circuit overruled the circuit's previous holding that private persons who conspired with state actors, themselves immune from suit under 42 U.S.C. § 1983, were entitled to derivative immunity. *Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976 (5th Cir.1979) (en banc) *aff'd sub nom., Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). In the present case, even if this Court had held Judge Dykes and defendant Weinberg immune, it would not by itself insulate Buzzy from liability. Buzzy may be liable if he himself acted under color of state law to deprive plaintiff of her constitutional rights and the required state action element would be satisfied if Buzzy conspired with a state official. For purposes of § 1983, a private person is engaged in a conspiracy if he "is a willful participant in joint action with the State or its agents." *Dennis v. Sparks,* 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980).

It was alleged in *Sparks* that one defendant bribed a state judge to grant an injunction and two other defendants acted as sureties for the injunction bond. The judge granted the injunction and plaintiffs were thereby prohibited from producing certain oil. The court held that matters alleged in the pleadings were sufficient to survive a motion to dismiss. *Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976 (5th Cir.1979) (en banc) *aff'd sub nom., Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). But the court cautioned that "mere conclusory allegations of conspiracy cannot, absent reference to material facts, survive a motion to dismiss." *Id.*

In *Cole v. Gray,* 638 F.2d 804 (5th Cir.) *cert. denied,* 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981), another § 1983 case, the Fifth Circuit reversed the district court's denial of motions for summary judgment as to two defendants, concluding that the evi-

dence did not support a theory of conspiracy.[7] The opinion states that Alabama State Senator Jones and Alabama State Representative Holmes were members of a joint interim committee to investigate the use of federal funds in the Military Department of the State of Alabama. Plaintiff Cole was an employee of the military department and a colonel in the Alabama National Guard. The committee turned up evidence that high ranking officers in the department, including Cole, had received pay for a substantial number of extra duty days in addition to their regular salaries. The Interim Committee was then dissolved. General Gray was appointed by the governor with instructions to "clean up the mess." General Gray contacted Jones, who gave Gray a great deal of information gleaned from the committee investigation. Gray first suspended Cole and later dismissed him from his position. On appeal to the Alabama Personnel Board, Cole was reinstated. Holmes publicly stated his opposition to Cole's reinstatement. Cole filed suit alleging, among other things, that Jones and Holmes acted to deprive Cole of his position without due process. The Fifth Circuit ruled that Jones and Holmes were entitled to absolute legislative immunity only for acts taken and statements made during their service on the Interim Committee but not for actions which were outside the sphere of legitimate legislative activities and which occurred after the committee was dissolved.

Since Gray was the person who actually fired Cole, Jones and Holmes could be liable only if they conspired with Gray. The court held that:

"the evidence does not nearly support a theory of conspiracy between Gray and the legislative defendants. Cole has shown a possible motive of personal animosity on the part of Jones, but there is not an iota of substantiation for his allegation that he was fired in retaliation for utterances protected by the First Amendment. He has shown minimal contact between the executive and legislative defendants, with no buttressing proof of the actual nature of the information conveyed. No proof of the making or accepting of statements known to be false exists in the record. Finally, there is the discharge itself. These elements, murky allegations as to motive plus mere contact plus the fact of discharge are linked together by speculation and conclusory allegations. The evidence was wholly insufficient to raise a fact issue for trial on the conspiracy complaint."

*Id.* at 811.

■ Assuming without deciding that plaintiff in this case was deprived of certain constitutional rights, the undisputed facts fail to show that Buzzy was a "willful participant in joint action" with the other defendants. As the Fifth Circuit emphasized in *Cole,* "murky allegations . . . linked together by speculation and conclusory allegations" are not enough to allow this lawsuit to continue on to trial. But beyond that, plaintiff has not shown that she was deprived of any constitutional right. It appears primarily that her claim was based on the fact that she received no notice of Buzzy's filing of the dependency petition in November of 1977 and that the petition was granted ex parte. Yet, as noted in an earlier portion of this opinion, she admitted that Buzzy told her he had obtained a court order that Aaron could not be taken out of Florida and she thereafter resided with Buzzy for several months. This Court will grant the motion for summary judgment as to Buzzy also since the undisputed facts fail to show evidence of any conspiracy as alleged.

### III.

After careful consideration of the copy of the state proceedings in *Dykes v. Dykes,* as well as all pleadings, affidavits, depositions and memoranda submitted, this Court finds that there are no disputed issues of material

---

**7.** The Fifth Circuit authorized an interlocutory appeal from the denial of the motions for summary judgment of two defendants.

fact and defendants are entitled to judgment as a matter of law. It is therefore appropriate to grant defendants' motions for summary judgment. Separate order will be entered in accordance herewith.