743 F.2d 1488
 Diana Christine DYKES, et al., Plaintiffs-Appellants,
v.
A.J. HOSEMANN, Jr., etc., Thomas A. Weinberg, etc., Roger
Francis Dykes, Sr., etc., and Roger Francis Dykes,
Jr., etc., Kenneth W. McIntosh, etc.,
Defendants-Appellees.
 No. 83-3347.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 11, 1984.
Opinion on Granting of Rehearing En Banc Dec. 18, 1984.
 
 J. Calvin Jenkins, Jr., William K. Meyer, Francis B. Burch, Baltimore, Md., for plaintiff-appellant.
 Douglas E. Whitney, District Counsel, Dept. of H & R Serv., Orlando, Fla., Haas, Boehm & Brown, P.A., Daytona Beach, Fla., James A. Edwards, Orlando, Fla., Gerald B. Curington, Asst. Atty. Gen., Tallahassee, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before GODBOLD, Chief Judge, HILL, Circuit Judge, and THORNBERRY*, Senior Circuit Judge.
 THORNBERRY, Senior Circuit Judge:
 
 
 1
 In this Sec. 1983 case, appellant Diana Christine Dykes ("Diana") alleges in essence that the appellees acted to deprive her of her constitutional right to raise her child without due process of law. The district court dismissed the suits against two of the appellees and granted the other three appellees' motions for summary judgment. We reverse and remand to the district court for further proceedings.
 
 I. Facts
 
 2
 Diana Dykes and Roger Francis "Buzzy" Dykes, Jr. ("Buzzy") began experiencing marital difficulties in 1977. In November 1977, Buzzy took the couple's only child, three-year-old Aaron Matthew Dykes ("Aaron"), the other appellant, from their Pennsylvania home to the Florida home of Buzzy's father and stepmother, Judge Roger F. Dykes ("Judge Dykes") and Alpine Dykes. The circumstances of this incident are in dispute.
 
 
 3
 What happened next is not altogether clear either. The appellants contend that Buzzy and Judge Dykes formulated a plan to obtain a colorable court order awarding custody of Aaron to Buzzy. According to the appellants, Judge Dykes, who is a Brevard County, Florida Circuit Court judge, telephoned Judge Anthony Hosemann, Jr., ("Judge Hosemann"), another Brevard County Circuit Court judge then assigned to the Juvenile Court, for advice. Judge Hosemann suggested that Buzzy come to him with a "dependency" petition, and referred Judge Dykes to the Florida Department of Health and Rehabilitative Services ("HRS"), the state social service agency in charge of dependent and delinquent children.
 
 
 4
 On the evening of November 21, Judge Dykes and Buzzy went to an HRS office and requested assistance in filing a dependency petition. The agency official on duty there, Kendrick Lofback, explained that the Juvenile Court's authority to award custody was restricted to dependent or delinquent children, and Aaron did not qualify:[1]
 
 
 5
 I told them that I wouldn't be able to help them, you know, that what we had to offer wasn't relevant to their situation, that they needed to get a lawyer and have something done through Circuit Court.
 
 
 6
 Lofback Deposition at 14.
 
 
 7
 According to Lofback, Judge Dykes persisted in the request, and Lofback called his supervisor, Thomas Weinberg, at home, to discuss the matter. Weinberg and Lofback finally agreed to go along with the petition, as long as it was not officially sponsored by HRS. Weinberg concedes that he might have told Lofback to help with the petition because Judge Dykes was a judge.
 
 
 8
 The next morning Weinberg presented a petition on behalf of Buzzy to Judge Hosemann, alleging as a basis for seeking custody the "real danger" that Diana might try to "abduct" Aaron. Buzzy had signed the petition and Weinberg had notarized it, although Weinberg admits that he did not administer an oath to Buzzy.[2] Buzzy waited outside Judge Hosemann's chambers while Weinberg presented the petition. Judge Hosemann signed the order finding Aaron to be a "dependent child" and awarded custody to Buzzy without any receipt of evidence.[3] Judge Hosemann admits that he had no basis for awarding custody of Aaron to Buzzy other than the fact that his father was a judge and the fact that the petition was presented by an HRS official.
 
 
 9
 No summons was ever directed to Diana, as the statute required,[4] nor was Diana ever informed prior to the November 22 proceeding that a custody order would be sought. Buzzy did call Diana after he had obtained the order and inform her that he had a court order preventing Aaron's removal from Florida. Diana did not believe him because she had consulted an attorney who had told her that a court could not award custody or prevent a child's removal from a state unless a divorce action had been commenced.
 
 
 10
 Shortly after the dependency proceeding, Buzzy, Diana, and Aaron got back together briefly. They closed up their Pennsylvania apartment, returned to Florida, and moved in with Judge Dykes and his second wife, Alpine. They soon moved again, this time in with Buzzy's mother, Judge Dykes' ex-wife Marilu.
 
 
 11
 On approximately January 23, 1978, Diana traveled with Aaron from Florida to her parents' home in Maryland. The circumstances of this move are in dispute.
 
 
 12
 After Diana left Florida, the Dykes family retained an attorney, Kenneth McIntosh, to help secure Aaron's return to Florida. A meeting was held between Buzzy, Judge Dykes, Judge Hosemann, Weinberg, and another HRS employee in Judge Hosemann's chambers on January 23, 1978. The group allegedly formulated a plan to bring Aaron back to Florida.
 
 
 13
 The next day, in accordance with the plan, Buzzy filed a petition for dissolution of marriage in Brevard County Circuit Court. The dissolution case was assigned to Judge Muldrew, another judge on the Brevard County Circuit Court bench. Judge Muldrew issued three orders ex parte: one granting temporary custody of Aaron to Buzzy and two Requests for Assistance to the Maryland juvenile authorities. Judge Hosemann also issued an ex parte order for Aaron's return and requesting the assistance of Maryland authorities. All four orders were based upon and referred to Judge Hosemann's original November 22, 1977 custody order. Each judge ordered Diana to appear in a different court on February 13, 1978 at 10:30 a.m.
 
 
 14
 On January 30, armed with the Florida orders, Buzzy flew to Maryland and proceeded to the Maryland Circuit Court, where he obtained a custody order requiring Diana to surrender Aaron. That night, accompanied by a Baltimore County Deputy sheriff, Buzzy went to Diana's parents' home, picked up Aaron, and returned to Florida. This was the first time that Diana received formal notice of the November 1977 custody adjudicated by Judge Hosemann.[5]
 
 
 15
 In February 1978, Diana flew to Florida to be with Aaron and to appear at the custody hearing before Judge Muldrew. On February 22, 1978, Judge Muldrew ordered HRS to do a social investigation of both parents' suitability as custodians; the study was to be completed within 60 days. The report, which made no custody recommendation, was finally completed almost nine months later, only after Diana's counsel had filed a contempt motion against HRS based on the delay. During all this time, Buzzy had custody of Aaron.
 
 
 16
 On August 15, 1978, Judge Muldrew issued a final judgment of dissolution of marriage. On February 22, 1979, he granted a permanent custody of Aaron to Buzzy. One of the primary reasons cited by Judge Muldrew for his decision was the fact that Buzzy had been the custodial parent during the past year.
 
 
 17
 Subsequently, Diana sought post-judgment relief, including the right to take post-trial discovery, on the grounds of judicial impropriety and undue influence in the custody proceedings. All these motions were denied. After her state appeals were denied, she filed this Sec. 1983 action.
 
 
 18
 In Diana's original complaint, both she and her son Aaron were named as plaintiffs. The four-count complaint alleged deprivation of the plaintiffs' constitutional rights in violation of 42 U.S.C. Secs. 1983 and 1985 by appellees Judge Hosemann, Judge Dykes, Buzzy Dykes, Thomas Weinberg, Kenneth McIntosh, and Alpine Dykes. Specifically, she claimed that the appellees, individually, and as part of a conspiracy, deprived her of custody of Aaron in violation of her procedural and substantive due process rights and her right to equal protection under the Fifth and Fourteenth Amendments. Chief Judge George C. Young dismissed this original complaint for failure to comply with Federal Civil Rule of Procedure 8(a). The plaintiffs then filed an amended complaint against all previously named defendants except Alpine Dykes.
 
 
 19
 The district court dismissed the Sec. 1985 actions for lack of an allegation of class-based animus. The appellants do not appeal this decision. The district court also dismissed Aaron as a party plaintiff on the grounds that he had not suffered any damages. The claim against Judge Hosemann was dismissed on the grounds of judicial immunity, and the claim against McIntosh was dismissed for lack of state action and insufficient allegations. The trial court also granted motions for summary judgment filed by Judge Dykes, Buzzy, and Weinberg. Diana and Aaron appeal all these orders.[6]
 
 II. Section 1983 Analysis
 
 20
 At the outset, we address the basis for the appellants' rather novel claim under 42 U.S.C. Sec. 1983.
 
 Section 1983 provides in pertinent part:
 
 21
 Sec. 1983. Civil action for deprivation of rights
 
 
 22
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
 
 
 23
 Two primary issues in a Sec. 1983 action are (1) whether the defendants violated the plaintiffs' constitutional rights, and (2) whether such violation was under color of state law. Scott v. Dixon, 720 F.2d 1542, 1545 (11th Cir.1983); Brown v. Miller, 631 F.2d 408, 410 (5th Cir.1980).
 
 
 24
 The gravamen of Diana's complaint and her basis for appeal is that her parental rights were terminated without notice and a hearing by means of an official act of a judge, which was the product of a corrupt conspiracy between the judge and the other appellants. Diana correctly points out that "the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection." Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614 (1983). "[S]tate intervention to terminate [such a] relationship ... must be accomplished by procedures meeting the requisites of the Due Process Clause." Id., quoting Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 1393, 71 L.Ed.2d 599 (1982). At a minimum, due process requires timely notice, in advance of a hearing in which parents' rights to custody are at stake. Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 1447, 18 L.Ed.2d 527 (1967). Furthermore, "before a person is deprived of a protected interest, he must be afforded an opportunity for some kind of hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event.' " Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977), quoting Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).
 
 
 25
 The "color of state law" component of Sec. 1983 may be satisfied by showing that an official act of a defendant judge was the product of a corrupt conspiracy involving the judge and other private parties. Dennis v. Sparks, 101 S.Ct. 183, 186 (1980). Even if the judge himself is held to be absolutely immune from suit (see section IIB infra ), the private parties who conspire with the judge act under color of state law for Sec. 1983 purposes. Id. at 187.
 
 
 26
 Here, Diana alleges, and the other parties do not dispute, that Diana was not given notice or a hearing before the dependency adjudication deprived her of custody of Aaron. She also alleges that the dependency adjudication was the product of a corrupt conspiracy between a judge and private parties. We conclude that Diana has at least stated a Sec. 1983 procedural due process claim. Accordingly, we address seriatim the appellees' liability for that claim.
 
 III. The Appellees' Liability
 A. Judge Hosemann
 
 27
 The claim against Judge Hosemann was dismissed on the grounds of absolute judicial immunity. It is well established that judges are immune from lawsuits for damages[7] for all judicial acts not taken in the clear absence of jurisdiction. Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Bradley v. Fisher, 13 Wall. 335, 20 L.Ed. 646 (1871); Randall v. Brigham, 7 Wall. 523, 19 L.Ed. 285 (1868). The appellants here argue that Judge Hosemann is not immune because (1) some of the acts complained of are nonjudicial in nature, and (2) his judicial acts were taken in the clear absence of jurisdiction.
 
 1. Nonjudicial Acts
 
 28
 The appellants do not contend that Judge Hosemann's participation in the dependency proceeding was not a "judicial act." Rather, they maintain that Judge Hosemann's implicit or explicit agreement prior to the dependency proceeding to grant Buzzy custody was a nonjudicial act.[8]
 
 
 29
 In Stump v. Sparkman, the Supreme Court discussed with approval the Fifth Circuit standard for what constitutes a judicial act for purposes of judicial immunity. 98 S.Ct. at 1107, citing McAlester v. Brown, 469 F.2d 1280, 1282 (1972). The Court stated that:
 
 
 30
 ... the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity.
 
 
 31
 Id.
 
 
 32
 The appellants rely on Rankin v. Howard, 633 F.2d 844 (9th Cir.1980), cert. denied Y451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981), where that court concluded that a judge's private, prior agreement to decide in favor of one party is not a judicial act. Id. at 847. Applying the Stump definition of "judicial act," the Rankin court reasoned:
 
 
 33
 Although a party conniving with a judge to predetermine the outcome of a judicial proceeding may deal with him in his "judicial capacity," the other party's expectation, i.e., judicial impartiality, is actively frustrated by the scheme. In any event, the agreement is not "a function normally performed by a judge." It is the antithesis of the "principled and fearless decision-making" that judicial immunity exists to protect. See Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967); Gregory v. Thompson, 500 F.2d at 63 [9th Cir.1974].
 
 
 34
 Id.
 
 
 35
 While it could be urged that the Rankin reasoning is persuasive, it appears that this circuit has, at least in dicta, rejected Rankin's conclusion concerning the nonjudicial character of prior agreements. In Harper v. Merckle, 638 F.2d 848 (5th Cir. Unit B), cert. denied 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981), this court stated, "we note that even a judge who is approached as a judge by a party for the purpose of conspiring to violate Sec. 1983 is properly immune from a damage suit." Id. at 856 n. 9. The Harper court relied on Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), where the Supreme Court stated in reference to the dismissal of a judge alleged to have conspired with private parties: "The courts below concluded that the judicial immunity doctrine required dismissal of the Sec. 1983 action against the judge who issued the challenged injunction, and as the case comes to us, the judge has been properly dismissed from the suit on the immunity grounds." Id. at 186. Subsequently, the Eleventh Circuit, in dismissing a claim against a court clerk on the grounds of judicial immunity, held that immunity would be assured despite the appellants' assertion that the court clerk and another defendant conspired with one another or reached an understanding about the judicial act to be performed. Scott v. Dixon, 720 F.2d 1542, 1546-47 (11th Cir.1983). Although we think the Rankin opinion is well-reasoned on this point, we follow Scott, and hold that even advance agreements between a judge and other parties as to the outcome of a judicial proceeding do not pierce a judge's immunity from suits for damages.
 
 2. Absence of Jurisdiction
 
 36
 The appellants also argue that Judge Hosemann is not immune from liability because he acted in the absence of either subject matter or personal jurisdiction.
 
 
 37
 a. Subject matter jurisdiction
 
 
 38
 It is clear that a judge who acts in the absence of subject matter jurisdiction may be held liable for his judicial acts. Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); Bradley v. Fisher, 13 Wall. 335, 20 L.Ed. 646 (1872). The rationale for this limitation on judicial immunity is set out in Bradley v. Fisher and reiterated in Stump v. Sparkman: "Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known, no excuse is permissible." Stump, 98 S.Ct. at 1104 n. 6, quoting Bradley, 13 Wall. at 351, 20 L.Ed. 646. Stump also points out that subject matter jurisdiction must be broadly construed where the issue is a judge's immunity, and notes a distinction between lack of jurisdiction and excess of jurisdiction. 98 S.Ct. at 1105. Illustrative of a clear lack of subject matter jurisdiction would be a situation where a probate judge, with jurisdiction only over wills and estates, would try a criminal case. The probate judge would not be immune from suit. On the other hand, if a judge of a criminal court convicted a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune. Id. at n. 7, citing Bradley, 13 Wall. at 352, 20 L.Ed. 646.
 
 
 39
 In the instant case, the appellants' argument regarding lack of subject matter jurisdiction is that because Aaron could not qualify as a "dependent" under Florida law, see note 1 supra, and accompanying text, Judge Hosemann was without jurisdiction over the case. This argument must fail. Section 39.02 of the 1977 Florida Statutes states that, "The circuit court shall have exclusive original jurisdiction of proceedings in which a child is alleged to be dependent or delinquent...." There is no question that Judge Hosemann was a circuit court judge, and that the petition presented to Judge Hosemann on November 22, 1977 alleged that Aaron was a "dependent" child. Accordingly, Judge Hosemann had subject matter jurisdiction of the case. Whether or not Judge Hosemann erred in his determination that Aaron was a "dependent" child is irrelevant to the issue of whether Judge Hosemann had subject matter jurisdiction to make such a determination. See Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978); Scott v. Hayes, 719 F.2d 1562, 1566-67 (11th Cir.1983).
 
 
 40
 b. Personal jurisdiction
 
 
 41
 Although we conclude that Judge Hosemann had subject matter jurisdiction to enter the order complained of, the appellants also contend that Judge Hosemann did not have personal jurisdiction to enter the order, and that such lack of personal jurisdiction abrogated his judicial immunity.
 
 
 42
 This is a question of first impression in the Eleventh Circuit.[9] Only the Ninth Circuit has thoroughly addressed this issue. Rankin v. Howard, 633 F.2d 844 (9th Cir.1980), cert. denied, 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981). But cf. Green v. Maraio, 722 F.2d 1013 (2d Cir.1983); Martin v. Aubuchon, 623 F.2d 1282 (8th Cir.1980).
 
 
 43
 In Rankin, the parents of a member of the Unification Church instituted guardianship proceedings in a Kansas probate court as part of a "deprogramming" plan. The judge granted the guardianship petition in an ex parte hearing without notice to the son, even though the son was then a resident of Missouri, a fact allegedly known by the judge. Subsequently, the son was lured away from his Missouri home and taken to Arizona for nine days of "deprogramming." He escaped and sued his parents, the deprogrammers, the lawyer involved, and the Kansas judge in a Sec. 1983 action.
 
 
 44
 In regard to whether absence of personal jurisdiction would abrogate judicial immunity, the Rankin court reasoned:
 
 
 45
 When the Supreme Court first formulated the "clear absence" standard, ... it stated that the principle of immunity applied when there was "jurisdiction of both subject and person." Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 352 (1872), 20 L.Ed. 646.
 
 
 46
 An absence of personal jurisdiction may be said to destroy "all jurisdiction" because the requirements of subject matter and personal jurisdiction are conjunctional. Both must be met before a court has authority to adjudicate the rights of parties to a dispute.
 
 
 47
 If a court lacks jurisdiction over a party, then it lacks "all jurisdiction" to adjudicate that party's rights, whether or not the subject matter is properly before it. See, e.g., Kulko v. Superior Court, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978) ("[i]t has long been the rule that a valid judgment imposing a personal obligation or duty in favor of the plaintiff may be entered only by a court having jurisdiction over the person of the defendant") (citations omitted)... Because the limits of personal jurisdiction constrain judicial authority, acts taken in the absence of personal jurisdiction do not fall within the scope of legitimate decisionmaking that judicial immunity is designed to protect. See Gregory v. Thompson, 500 F.2d at 63. We conclude that a judge who acts in the clear and complete absence of personal jurisdiction loses his judicial immunity.
 
 
 48
 Id. at 848-849 (footnotes omitted).
 
 
 49
 We agree with the Rankin court's analysis. We point out in addition, that the rationale for the limitation on judicial immunity when subject matter jurisdiction is lacking applies with equal force when personal jurisdiction is lacking. In Bradley v. Fisher, the court stated that where there is no jurisdiction over the subject matter, any authority exercised is a usurped authority. 13 Wall. at 351, 20 L.Ed. 646. Although the modern conception of personal jurisdiction generally refers to due process, see, e.g., International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the foundation of personal jurisdiction has always been a court's power to act. McDonald v. McBee, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608 (1917); Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1878). When a court acts without personal jurisdiction, its authority is as much a usurped authority as when the court acts without subject matter jurisdiction.
 
 
 50
 We also agree with the Rankin court that immunity for judicial acts in the clear absence of jurisdiction is lost only if the judge knows that he lacks jurisdiction, or acts in the face of clearly valid statutes or case law expressly depriving him of jurisdiction. See 633 F.2d at 849. Issues of jurisdiction are often complex, and judges should be free to decide them without concern that their errors may subject them to liability.
 
 
 51
 In the instant case, the federal district court judge assumed that a court which had subject matter jurisdiction did not act in the clear absence of jurisdiction. The court refused to reconsider its ruling when the appellants introduced Rankin as new authority. Because the issues of whether Judge Hosemann knew he lacked personal jurisdiction or acted in the face of clearly valid statutes or case law expressly depriving him of jurisdiction are matters for initial determination in the district court, we reverse the order dismissing the claim against Judge Hosemann and remand to the district court for further proceedings not inconsistent with this opinion.[10]
 
 B. Thomas Weinberg
 
 52
 The district court granted summary judgment to Florida Health and Rehabilitative Services official Thomas Weinberg because it found that as a state executive official he was entitled to qualified immunity.
 
 
 53
 The standard for such qualified immunity is set out in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):
 
 
 54
 ... government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 55
 Id. at 2738. See also Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir.1983). Where an individual official would be expected to know that certain conduct would violate statutory or constitutional rights he should be made to hesitate. Harlow v. Fitzgerald, 102 S.Ct. at 2739; Scott v. Dixon, 720 F.2d 1542, 1548 (11th Cir.1983).
 
 
 56
 Weinberg does not argue that he should not be expected to know that adjudicating Diana's right to custody without notice to her would violate her constitutional rights. Instead, he asserts that he just did his job and that at any rate it was not his duty to notify Diana of the dependence proceeding. His position is that he did not deprive the appellants of any constitutional rights.
 
 
 57
 However, Weinberg does not adequately address the appellants' contention that Weinberg acted as part of a conspiracy to deprive the appellants of their constitutional rights. To show a conspiracy to violate Sec. 1983, the appellants must show that the appellees "reached an understanding" to violate their rights. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); Crowe v. Lucas, 595 F.2d 985 (5th Cir.1979). See also Cole v. Gray, 638 F.2d 804 (5th Cir.), cert. denied, 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981). Even if it was not Weinberg's personal statutory duty to notify Diana, he could be held liable on a conspiracy theory if he reached an understanding with the other appellees to violate Diana's constitutional rights.
 
 
 58
 Summary judgment is inappropriate where the record, examined in the light most favorable to the party opposing the motion shows any material facts in dispute. Adickes v. S.H. Kress & Co., 90 S.Ct. at 1609. Weinberg's participation in the petition process on his day off, the testimony of HRS official Kenneth Lofback concerning the propriety of a dependency proceeding under the circumstances of the case, the meeting between Weinberg, Judge Dykes, Buzzy and Judge Hosemann in Judge Hosemann's chambers to formulate a plan to regain physical custody of Aaron and other evidence in the record at least indicates that fact issues exist as to whether Weinberg took part in a conspiracy to violate the appellants' constitutional rights. Accordingly, summary judgment for Weinberg is reversed.
 
 C. Judge Dykes and Buzzy Dykes
 
 59
 The district court granted summary judgment in favor of Judge Dykes because his actions constituted normal grandfatherly concern rather than action under color of state law. However, as previously discussed (see section IIA supra ), the requisite element of action under color of state law for Sec. 1983 purposes is provided by Judge Hosemann's alleged participation in the alleged conspiracy, whether or not Hosemann is held to be immune from suit. Dennis v. Sparks, 101 S.Ct. at 186.
 
 
 60
 The appellants have presented documentary evidence in the form of Judge Dykes' notes both before and after the custody order, from which inferences can be drawn that Judge Dykes was the instigator of the dependency petition and the plan to regain physical custody of Aaron by means of the original order. These notes, in addition to other testimonial and circumstantial evidence in the record convince us that triable fact issues exist as to Judge Dykes' participation in a conspiracy to deprive the appellants of their constitutional rights.
 
 
 61
 As to Buzzy Dykes, the district court concluded that the undisputed facts failed to show that Buzzy was a willful participant in joint action with the other defendants.[11] To the contrary, we find sufficient evidence that Buzzy participated in joint action with the other appellants. He gave Weinberg the information for the dependency petition, he met with several of the appellants in Judge Hosemann's chambers to plan how to regain custody of Aaron, and he flew to Maryland with all the court orders and picked up Aaron. The real question is whether there was a conspiracy to violate the appellants' constitutional rights. Because a jury could draw inferences of a conspiracy from the evidence presented, we hold that the summary judgment in favor of Buzzy was unwarranted.
 
 D. Attorney McIntosh
 
 62
 The district court dismissed attorney Kenneth McIntosh as a party defendant on the basis that, Judge Hosemann already having been immunized, McIntosh did not act under color of state law. As previously discussed (see section IIA supra ), private parties who conspire with an immune judge in connection with the judge's official acts are acting under color of state law and may be held liable under Sec. 1983. Dennis v. Sparks, 102 S.Ct. at 186. Accordingly, the ground upon which the district court rested its dismissal of McIntosh is erroneous.
 
 
 63
 However, the district court also mentioned in passing on attorney McIntosh's motion to dismiss that he did not think that there were sufficient allegations against McIntosh. On appeal, McIntosh argues that we should affirm the district court on this basis.
 
 
 64
 With regard to a motion to dismiss for failure to state a claim, a Sec. 1983 complaint should not be dismissed unless it appears that the plaintiff can prove no set of facts which would entitle him to relief. Doe v. Public Health Trust of Dade County, 696 F.2d 901, 907 (11th Cir.1983) (Hatchett, J., specially concurring); Richardson v. Fleming, 651 F.2d 366, 368 (5th Cir.1981). For purposes of testing sufficiency of the complaint, the allegations of the complaint must be taken as true. Richardson, 651 F.2d at 368. Furthermore, private attorneys alleged to have conspired with immune state officials may be held liable under Sec. 1983. Id. at 371. Here, the appellants allege that the appellees, including McIntosh, conspired to utilize the allegedly illegal November 22, 1977 custody order to obtain permanent custody of Aaron, and that McIntosh knew or should have known that that order was improper and illegal. Taking these allegations as true, we hold that if proven, they could entitle the appellants to Sec. 1983 relief against McIntosh. Accordingly, dismissal of the appellants' complaint against McIntosh is reversed.
 
 IV. Other Issues
 A. Dismissal of Aaron as a plaintiff
 
 65
 The district court dismissed Aaron as a plaintiff sua sponte because of the court's conclusion that Aaron had suffered no damages. This ruling was made from the bench without motion, briefing or argument, in response to a different motion to dismiss Aaron as a plaintiff on the grounds that Diana was not a proper person to sue as Aaron's next friend while Buzzy was his legal guardian. Diana and Aaron appeal this dismissal.
 
 
 66
 Damages for mental and emotional stress caused by the denial of procedural due process may be awarded in a Sec. 1983 action. Carey v. Piphus, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). Absent proof of actual injury, nominal damages may be awarded. Id. at 266-67, 98 S.Ct. at 1053-1054. Punitive damages may be awarded in a Sec. 1983 action even without a showing of actual loss by the plaintiff if the plaintiff's constitutional rights have been violated. McCulloch v. Glasgow, 620 F.2d 47, 51 (5th Cir.1980).
 
 
 67
 In the instant case, Diana testified in her deposition that Aaron suffered emotional distress as a result of being deprived of his mother's care and companionship. If Aaron's constitutional rights were violated, he might have been entitled to nominal damages even without proof of actual injury. Because an issue of material fact remained as to whether Aaron suffered damages, his dismissal as a plaintiff on this ground was error.[12]
 
 B. Res Judicata
 
 68
 The appellees argue that the appellants have litigated or have had the opportunity to litigate their due process claims in state court and that therefore they should be precluded from reasserting them in federal court.[13] The district court agreed with the appellees.
 
 
 69
 A recent Supreme Court case holds that a state court judgment has the same claim preclusive effect in a Sec. 1983 suit in federal court as that judgment would have in courts of the state from which it was issued. Migra v. Warren City School District Board of Education, --- U.S. ----, ----, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984). Furthermore, both sides agree that a recent Florida case clearly sets forth Florida law on claim preclusion. Albrecht v. State, 444 So.2d 8 (Fla.1984). There the Florida Supreme Court stated:
 
 
 70
 [W]hen the second suit is between the same parties, but based upon a different cause of action from the first, the prior judgment will not serve as an estoppel except as to those issues actually litigated and determined in it.... Therefore, if the cause of action is not the same there will be no estoppel as to those issues which could have been litigated in the previous action. The determining factor in deciding whether the cause of action is the same is whether the facts or evidence necessary to maintain the suit are the same in both actions.
 
 
 71
 Id. at 12 (citations omitted).
 
 
 72
 As in Migra, it is not apparent whether the district court in the instant case applied state or federal law in concluding that "the state decisions would seem to put this matter to rest ...." Therefore, like the Migra court, we remand to the district court for initial interpretation and application of Florida law on this point. See Migra, --- U.S. at ----, 104 S.Ct. at 899.
 
 V. Conclusion
 
 73
 We reverse the district court's judgments as to each of the appellees and remand for further proceedings not inconsistent with this opinion. The appellees' requests for attorney fees are accordingly DENIED.
 
 
 74
 REVERSED and REMANDED.
 
 
 75
 JAMES C. HILL, Circuit Judge, dissenting.
 
 
 76
 This section 1983 action arises as the result of a very unfortunate dispute between an estranged husband and wife over the custody of their child. If there are any cases where conclusory allegations of conspiracy and wrongdoing are likely to be made against a judge and other persons involved in the dispute, they are cases such as this, where the strongest emotions of both parties are unleashed. A court must strictly scrutinize conclusory allegations in a case like this, given the ease with which they can be made by a disappointed party.
 
 
 77
 It is easy to sympathize with appellant Diana Dykes' plight under the unusual facts of this case. There is little doubt that Buzzy Dykes occupied a favorable position in litigating against Diana in the Florida courts, due to Buzzy's father's position as a Florida circuit court judge. However, I do not know how the law can remedy this situation, short of holding that a judge or his family may not litigate contested issues in court without being subject, along with the judge that hears the issues, to a charge of conspiracy. Thus, although I assume that appellant's allegations of conspiracy are sufficient to state a claim under section 1983, I dissent from the majority because it is clear to me that these allegations are unfounded and without support on the record of this case; and therefore that the dismissal of all defendants by the district judge was proper.
 
 I. JUDGE HOSEMANN
 
 78
 In considering judicial immunity, two things must be kept in mind. First, immunity is designed to prevent a disgruntled litigant from hauling a judge into court and requiring him to justify and defend his decision. See Beard v. Udall, 648 F.2d 1264, 1269 (9th Cir.1981). In this respect, a policy determination has been made that the public interest in ensuring the independence of the judiciary outweighs the likelihood that a certain number of bad acts by specific judges will go unpunished. Second, immunity is meaningless if it is granted only to those who do nothing wrong. Judicial immunity is intended not to protect wrongdoers, but to protect all judges who undertake to resolve issues thrust upon them that they are in no position to decline. However, if immunity is to amount to anything, there will be immunity for very bad conduct. A judge may rule incorrectly, or even in bad faith, in which case there may be a temptation to express strong disapproval of his actions by finding that he has made himself liable for damages. This temptation must be resisted.
 
 
 79
 It is undisputed that Judge Hosemann erred in granting the November 22, 1977, temporary custody order based on the dependency petition presented to him. However, this error should not deprive him of judicial immunity under the facts of this case.
 
 
 80
 A. Nonjudicial Acts.
 
 
 81
 The majority follows Scott v. Dixon, 720 F.2d 1542 (11th Cir.1983), and Harper v. Merckle, 638 F.2d 848, 856 n. 9 (5th Cir. Unit B), cert. denied, 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981) in holding that "even advance agreements between a judge and other parties as to the outcome of a judicial proceeding do not pierce a judge's immunity from" damage suits. I completely agree, and write here merely to express displeasure over the majority's approval of the reasoning of Rankin v. Howard, 633 F.2d 844 (9th Cir.1980), cert. denied, 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981), which held the opposite.
 
 
 82
 When a judge is approached by a litigant and presented with a petition, it is his duty to rule on the petition. In doing so, he is performing a normal judicial function and is immune from suit, regardless of the fact that he may have earlier agreed to decide in favor of one party.[1] Harper v. Merckle, 638 F.2d at 856 n. 9, 859; see Dennis v. Sparks, 449 U.S. 24, 26-27, 101 S.Ct. 183, 185-186, 66 L.Ed.2d 185 (1980). The Harper case emphasized the narrow factual circumstances under which a judge's acts will be found non-judicial and thus subject him to liability.[2] These circumstances are not present in Judge Hosemann's situation, even if we were to assume that he reached a prior agreement to rule in favor of Buzzy Dykes.[3]
 
 
 83
 The grave implication of the Rankin decision is that, based on conclusory allegations of conspiracy and prior agreements, judges will often be called into court and examined and cross-examined about their judicial decisions merely because they were called upon as judges to deal with unpleasant cases.
 
 
 84
 B. Personal Jurisdiction.
 
 
 85
 The majority opinion relies on Rankin v. Howard, 633 F.2d 844 (9th Cir.1980), cert. denied, 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981) in remanding to the district court to determine whether Judge Hosemann knew that he lacked personal jurisdiction or acted in the face of clearly valid law expressly depriving him of personal jurisdiction. I strongly dissent from this portion of the opinion, which represents an alarming break with what has generally been considered necessary to pierce judicial immunity.
 
 
 86
 In Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), the Supreme Court stated that
 
 
 87
 the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction."
 
 
 88
 Id. at 356-57, 98 S.Ct. at 1105 (citing Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1872)). The court further explained that "[a] judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by grave procedural errors," such as the "failure to comply with elementary principles of procedural due process." Id. at 359, 98 S.Ct. at 1106.
 
 
 89
 The majority opinion in this case goes much farther towards abrogating judicial immunity than Stump indicates is appropriate. Indeed, the Rankin holding on personal jurisdiction has been severely limited by subsequent Ninth Circuit cases, indicating an almost immediate realization by that circuit that it had gone too far in Rankin.
 
 
 90
 In O'Neil v. City of Lake Oswego, 642 F.2d 367 (9th Cir.1981), the Ninth Circuit determined that a pro tem municipal judge's action in convicting a defendant of contempt (an offense generally within his court's jurisdiction) without requisite papers to confer jurisdiction over the particular alleged commission of the offense, constituted merely an act in excess of jurisdiction, and not an act in the clear absence of jurisdiction; thus the judge was held immune from liability. The court distinguished the situation in which a judge violates a rule of law expressly depriving it of jurisdiction (no immunity), from the case where a court merely fails to "comply with all the [procedural] requirements of a statute conferring jurisdiction," in which case the judge is still immune. Id. at 369-70. In explanation, the court stated that "fearless decision-making is fostered by granting judges immunity ... even when they fail to comport with procedural niceties necessary to give the court power over the particular matter." Id.
 
 
 91
 Beard v. Udall, 648 F.2d 1264 (9th Cir.1981), involved facts surprisingly similar to our present case. Following a divorce decree under which the father was awarded custody of the children, the mother moved to another county and began working for a lawyer. While the children were visiting the mother, the lawyer petitioned a judge to modify the original divorce decree and to award custody of the children to the mother. The judge set a hearing on an order to show cause and entered a temporary restraining order preventing the father from removing the children from the county. Before the judge could rule on the petition for modification, the father "kidnapped" the children and took them back to his home. The father was then arrested for kidnapping and other felonies, though never prosecuted. He brought a Sec. 1983 action alleging that the judge, the mother's lawyer, and the sheriff acted to deprive him of his civil rights. In particular, he alleged that the judge had acted in the clear absence of jurisdiction by failing to follow certain applicable statutory procedural requirements, related to notice and hearing,[4] before issuing the order to show cause and the TRO. Id. at 1268. The Ninth Circuit held that:
 
 
 92
 The fact that a judge commits "grave procedural errors" is not sufficient to deprive a judge of absolute immunity. Stump, 435 U.S. at 359, 98 S.Ct. at 1106. Thus, even if Beard's allegations that Judge Greer failed to adhere to the procedural rules established by the Arizona statutes are true, judicial immunity precludes Beard from recovering for this alleged wrongful act.
 
 
 93
 Id. at 1269.
 
 
 94
 In our present case, it is undisputed that appellant Diana Dykes did not receive notice or a hearing prior to the entry of the November 22, 1977, temporary custody order. I assume, although it is certainly not clear,[5] that notice to the mother was required in order to obtain personal jurisdiction over the child and the case. Even so, this is squarely the situation faced in the Beard case, and analogous to the situation in O'Neil. Although Judge Hosemann may have proceeded erroneously, the most that can be said is that he committed a "grave procedural error" by failing to comply with all of the "procedural niceties" necessary to confer jurisdiction. In no respect did he act in such a "clear absence" of jurisdiction as to deprive him of his judicial immunity. The absence of notice and hearing is a flaw in the order itself, to be corrected on appeal or collateral attack, not by a section 1983 damages action brought against the judge.[6]
 
 II. THOMAS WEINBERG
 
 95
 The majority states the correct standard for granting qualified immunity to a state executive official, but then fails to consider the facts of this case in reversing summary judgment, which was granted on the basis of that immunity.
 
 
 96
 The district court opinion granting summary judgment in this case sets out Weinberg's statutory duties in the processing of a dependency petition. Dykes v. Weinberg, 564 F.Supp. 536, 541-42 (M.D.Fla.1983). The facts show that Weinberg properly concluded that the HRS would not initiate a dependency proceeding on behalf of Buzzy Dykes, and then, as required by the Florida statute, he advised Buzzy and Judge Dykes that they had a right to file their own petition. Weinberg and Kenneth Lofback also assisted the Dykes in the preparation of the petition and its presentment to Judge Hosemann; but affidavits from Weinberg and three other HRS employees state that this was a customary HRS practice, and the appellant has presented no evidence to the contrary. Weinberg did meet with Hosemann and the Dykes to discuss the possibilities for regaining custody of the child after Diana took the child back to Maryland with her; but again, the HRS affidavits indicate that the HRS is an arm of the court in juvenile matters, with a duty to advise the judge when he asks for assistance in a juvenile case.
 
 
 97
 In short, appellant's bald assertions that Weinberg was participating in a conspiracy are met by undisputed facts which indicate that Weinberg was merely acting according to his statutory duty and customary HRS practice and procedure. If there is such a thing as qualified immunity for a state official, then nothing has been shown here to pierce it. Summary judgment was proper.
 
 III. ATTORNEY MCINTOSH
 
 98
 Appellant's only allegations as to McIntosh's participation in the "conspiracy" is that he planned with Buzzy and Judge Dykes to use the "illegal and improper" November 22nd custody order, which he knew or should have known was illegal. Amended Complaint, p 14. This is probably sufficient to satisfy the "under color of state law" requirement in section 1983, since this conspiracy allegedly involved two state agents, Judge Dykes and HRS official Weinberg. See Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). However, the complaint sets forth absolutely no acts of conspiracy or active cooperation between McIntosh and the other defendants in this case, outside of actions within the normal attorney-client relationship.
 
 
 99
 McIntosh was retained by Buzzy and Judge Dykes around the end of January, 1978, about two months after the disputed November 22, 1977, order had been entered. This order was facially valid; it had never been appealed or held unlawful. McIntosh, representing Buzzy, filed a petition in the Florida courts for dissolution of marriage and custody of Aaron. It is undisputed that McIntosh never had any contact with Weinberg, and met Judge Hosemann only at a February show cause hearing in which he represented Buzzy. Appellant alleges no other conduct by McIntosh that would lend any support to her conspiracy claim. Her allegations indicate only that McIntosh was acting properly as an advocate, using each arsenal at his disposal.[7]
 
 
 100
 It is unclear whether the district judge dismissed McIntosh for failure to show state action, or for failure to state a claim. But it is clear that McIntosh can properly be dismissed for failure to state a claim, since the complaint is totally devoid of any allegation setting out an act of conspiracy between McIntosh and the other defendants, outside of the normal attorney-client relationship.
 
 IV. JUDGE AND BUZZY DYKES
 
 101
 As was the situation with McIntosh, there are sufficient allegations of cooperation between the Dykes' and the two state agents in this case to satisfy the "under color of state law" requirement pursuant to Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185. However, a careful review of the record indicates that both Judge and Buzzy Dykes are properly entitled to summary judgment in this case. Viewing the evidence in the light most favorable to appellant, there is no genuine issue as to the existence of a conspiracy. Appellant's allegations in this case stem merely from the fact that the child's grandfather happened to be a judge.[8] Murky allegations of a conspiracy, combined with proof of mere contact between the defendants and the fact of a favorable ruling on the petition at issue, are insufficient to raise a fact issue for trial on a conspiracy complaint under Sec. 1983. See Cole v. Gray, 638 F.2d 804, 811 (5th Cir.), cert. denied, 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981). Thus, summary judgment was properly granted to both Judge and Buzzy Dykes.
 
 IV. CONCLUSION
 
 102
 In sum, the possibility that Buzzy Dykes may have occupied a favorable litigating position by virtue of his father's position as a state court judge is insufficient to sustain a Sec. 1983 conspiracy claim against all parties involved in the original lawsuit, where certain of the defendants were immune to suit, and the underlying actions of the other defendants do not substantiate the conspiracy allegations.
 
 
 103
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 
 104
 Before GODBOLD, Chief Judge, RONEY TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.
 
 BY THE COURT:
 
 105
 A member of this Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in this Court in active service having voted in favor of granting a rehearing en banc,
 
 
 106
 IT IS ORDERED that the cause shall be reheard by this Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of en banc briefs.
 
 
 
 *
 Honorable Homer Thornberry, U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Under Florida law then in effect, a "dependent child" was a defined term:
 (8) "Dependent child" means a child who:
 (a) Has been abandoned by his parents or other custodians.
 (b) For any reason, is destitute or homeless.
 (c) Has not proper parental support, maintenance, care, or guardianship.
 (d) Because of the neglect of his parents or other custodians, is deprived of education as required by law, or of medical, psychiatric, psychological, or other care necessary for his well-being.
 (e) Is living in a condition or environment such as to injure him or endanger his welfare.
 (f) Is living in a home which, by reason of the neglect, cruelty, depravity, or other adverse condition of a parent or other person in whose care the child may be, is an unfit place for him.
 (g) Is surrendered to the Department of Health and Rehabilitative Services or a licensed child-placing agency for purpose of adoption.
 (h) Has persistently run away from his parents or legal guardian.
 (i) Being subject to compulsory school attendance, is habitually truant from school.
 Fla.Stats. Sec. 39.01(8) (1977).
 In 1978, the Florida State Legislature revised Chapter 39 and it became known as the Florida Juvenile Justice Act, with new sections effective October 1, 1978.
 
 
 [2]
 The applicable statute stated that the petition "shall be signed by the petitioner under oath stating his good faith in filing the petition." Fla.Stat. Sec. 39.05(3) (1977)
 
 
 [3]
 Under the statute, an adjudicatory hearing was required to be held to determine whether or not the child was "dependent" within the meaning of Sec. 39.01(8). Fla.Stat. Sec. 39.09(1) (1977). The determination of dependency was permissible only upon a preponderance of the evidence. Id. at Sec. 39.09(1)(b). Furthermore, once a child had been adjudicated a dependent, the court was required to hold a disposition hearing, at which it was to consider a predisposition study presented by an agent of HRS. Id. at Sec. 39.09(3). Here, the adjudication and the disposition were combined into one hearing where no evidence was presented
 
 
 [4]
 The statute provided:
 (2) Upon the filing of a petition containing allegations of facts which, if true, would constitute the child therein named a dependent child, delinquent child, or a child in need of supervision, and upon the request of the petitioner, the clerk or deputy clerk shall issue a summons.
 (3) The summons shall require the person on whom it is served to appear for a hearing at a time and place specified. The time shall not be less than twenty-four hours after service of the summons. If the child is not detained by an order of the court, the summons shall require the custodian to produce the child at the said time and place. A copy of the petition shall be attached to the summons.
 (4) The summons shall be directed to, and shall be served upon, the following persons:
 (a) [The child if delinquent];
 (b) The parents; and
 (c) The legal custodians, actual custodians, and guardians ad litem, if there be any other than the parents.
 Fla.Stat. Sec. 39.06 (1977).
 
 
 [5]
 By the time Diana received formal notice of the November 1977 custody order, her 30-day period for appealing the order under Sec. 39.14(1) of the Florida Statutes had elapsed
 
 
 [6]
 On appeal, the appellants only argue that their rights to procedural due process were violated by the appellees individually and as part of a conspiracy, and have apparently abandoned their equal protection and substantive due process claims
 
 
 [7]
 We note that the Supreme Court this term has held that judicial immunity is not a bar to prospective injunctive relief against a judicial officer. Pulliam v. Allen, --- U.S. ----, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984)
 
 
 [8]
 The appellees argue that the appellants failed to raise the nonjudicial act theory in the district court. The appellees are mistaken. The appellants raised the nonjudicial act theory in a Motion for Reconsideration of the Order Dismissing Judge Hosemann in Light of New Authorities. The district court denied this motion on June 3, 1981, and the appellants noted an appeal of this denial
 
 
 [9]
 The Supreme Court in Stump v. Sparkman acknowledged that Judge Stump may have committed "grave procedural errors" when he ordered a 15-year-old "somewhat retarded" girl sterilized on the petition of her mother but without notice to or appointment of an attorney ad litem for the girl. 98 S.Ct. at 1106. However, as the Rankin court noted, the Supreme Court did not explicitly consider whether Judge Stump acted in the clear absence of personal jurisdiction or whether such action would be protected by judicial immunity. 633 F.2d at 848
 
 
 [10]
 Judge Hosemann argued in his brief that Florida statutes required only personal jurisdiction over the child Aaron in dependency cases. He based this argument on Sec. 39.06(7), which provided:
 (7) The jurisdiction of the court shall attach to the child and the case when the summons is served upon the child, a parent or legal or actual custodian of the child...
 Although no summons was served on anyone in the case, Hosemann pointed to Sec. 39.06(1), which stated:
 (1) Personal appearance of any person in a hearing before the court shall obviate the necessity of serving process on that person.
 According to Hosemann, the fact that Buzzy's name was on the petition and Buzzy's presence outside the judge's chambers constituted constructive appearance, obviating the need for service on Buzzy, and attaching the jurisdiction of the court to the case.
 When questioned at oral argument, Hosemann's attorney seemed to concede that personal jurisdiction over Diana was necessary for the entry of the custody order, and that it did not exist.
 
 
 [11]
 The district court also held as a matter of law that Diana's constitutional rights had not been violated since Buzzy told her that he had a court order preventing Aaron's removal from Florida. In light of the lack of formal notice to Diana before entry of the order, and Diana's testimony that she did not believe Buzzy, we cannot hold such "notice" constitutionally adequate as a matter of law. (See section II supra.)
 The Dykes cite Thompson v. Bass, 616 F.2d 1259 (5th Cir., cert. denied, 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980) ), for the proposition that failure to give proper notice can be cured by subsequent proceedings in which adequate notice and hearings are provided. We note first of all that this circuit has not applied the Thompson case to situations other than employee terminations. Furthermore, in this Sec. 1983 action, the question of whether Diana was injured as a result of the November 1977 custody order, or whether the subsequent custody proceedings did cure the original lack of notice, is one for the jury. In this context, we point out that all court orders in the state custody proceedings were based on and referred to the original November 1977 order, and that the final custody order was based largely on the fact that because of the original order Buzzy had already had custody of Aaron for a year.
 
 
 [12]
 We express no opinion as to the appellees' argument on representative capacity, which we leave for initial determination by the district court
 
 
 [13]
 Appellees Weinberg and Hosemann also argue that because federal courts do not have jurisdiction to review, modify, or nullify an order of a state court, the federal district court was without jurisdiction in the instant case. This argument is without merit. The appellants did not seek to have the federal district court review a state court order; they sought damages for violation of constitutional rights
 
 
 [1]
 Judge Hosemann's ruling on the dependency petition satisfies this circuit's four factor test for a judicial act, in that: (1) the events involved occurred in Judge Hosemann's chambers; (2) the controversy centered around the dependency case pending before the Judge; (3) the confrontation arose directly out of a visit to Judge Hosemann in his official capacity; and (4) the precise act complained of, Judge Hosemann's ruling on the petition, is a normal judicial function. See Harper v. Merckle, 638 F.2d at 858
 It is improper and overly formalistic to separate a judge's prior agreement to decide in favor of one party from the specific act of ruling on the case itself, as the Rankin court did, 633 F.2d at 847, because that separates the rationale behind the decision from the decision itself. As mentioned earlier, judicial immunity is intended to protect a judge from being brought into court and forced to justify each decision that he makes.
 
 
 [2]
 The "exceedingly narrow" holding in Harper was that a judge's actions are not "judicial acts" only when "it is beyond reasonable doubt that a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, and it further appears that no party has invoked the judicial machinery for any purpose at all." 638 F.2d at 859
 
 
 [3]
 A judge who conspires to rule in favor of a party in a pending case is a bad judge who is performing improper and unethical acts; but this should be remedied by impeachment, or at the following judicial elections, and not by a section 1983 action
 
 
 [4]
 It was alleged in Beard that the judge violated one Arizona statute requiring a notice and hearing before an order to show cause on a petition for modification could be issued, and another statute requiring that a TRO issued without notice "define the injury and state why it is irreparable and why the order was issued without notice." Beard, 648 F.2d at 1268 n. 4
 
 
 [5]
 Footnote 10 of the majority opinion clearly illustrates that there is a good deal of uncertainty as to the Florida statutory requirements for personal jurisdiction in a dependency case. Florida Statutes Sec. 39.06(7) states that jurisdiction attaches to the child and the case when a summons is served upon the child or "a parent," and Sec. 39.06(1) provides that personal appearance of any person at a hearing obviates the necessity of serving a summons. This is a notice requirement, and there is no doubt that Buzzy, who is "a parent," had actual notice of the dependency proceedings, whether or not he "constructively" appeared before Judge Hosemann
 
 
 [6]
 It is interesting to note that Diana never attempted to appeal the November 22nd order. Moreover, that order merely provided for temporary custody, with a full hearing on custody to be held later. Diana appeared at a Florida custody hearing before Judge Muldrew in February, 1978, at which it was determined that Buzzy would retain temporary custody pending an HRS report on the parents' suitability as permanent custodians
 
 
 [7]
 Most lawyers "conspire" with their clients, in the sense of discussing and planning the strategy of a case. There is nothing alleged here other than this normal planning between an attorney and his client
 A lawyer is not required to inquire into the circumstances under which each facially valid order that he comes into contact with was issued. If a lawyer did find out that a previous order favoring his client was improperly entered he might be justified in refusing to use the order and recusing from the case. But if he merely takes an order sufficient on its face and uses it in advocating his client's rights, there can be no liability.
 
 
 [8]
 If a prominent doctor, clergyman or industrialist in Brevard County had telephoned Judge Hosemann in the same situation, and an identical set of events had unfolded, it is doubtful that appellant would have gone very far with her conspiracy claim. The law should be no different when a judge's or a lawyer's family is involved in litigation. Otherwise, we are effectively holding that a judge or his family may not litigate contested issues in court without being subject to a conspiracy charge