**In re GREEN RIVERS FOREST, INC., Debtor.**

**Bankruptcy No. 93–53837.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Oct. 16, 1995.

478

Wesley J. Boyer, Brown, Katz, Flatau & Hasty, Macon, GA, for Debtor.

Thomas C. James, III, Jones, Cork & Miller, Macon, GA, for Alabama Life Insurance Company.

Richard F. Casher, Elliot N. Solomon, Hebb & Gitlin, Hartford, CT, John T. McGoldrick, Jr., Martin, Snow, Grant & Napier, Macon, GA, Eugene S. Hatcher, Anderson, Walker & Reichert, Macon, GA, for Aetna Life Insurance Company.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

Green Rivers Forest, Inc., ("Debtor") initiated this Motion To Revoke Permission To Practice Pro Hac Vice And For Sanctions Under Rule 11 Of The Federal Rules Of Civil Procedure[1] against Aetna Life Insurance Company and its counsel Hebb & Gitlin (collectively "Aetna"). Based on the following analysis, the Court will deny Debtor's motion.

### FINDINGS OF FACT

Over the course of litigation regarding confirmation of Debtor's plan, Aetna repeatedly made allegations of bad faith, ex parte communications, and judicial misconduct during the state court liquidation proceedings of the Alabama Life Insurance Company ("ALIC"), a creditor in this Chapter 11 case. Aetna sought to present evidence of this alleged misconduct in an effort to persuade this Court to designate ALIC's vote as a rejection of the plan pursuant to 11 U.S.C. § 1126(e). This Court denied Aetna's Motion To Designate ALIC's vote, and Debtor brought the present motion.

The course of events in the Alabama State Court were the source of Aetna's contentions in its Motion To Designate, and provide a background for Debtor's present motion. On October 7, 1994, a hearing was held before the Alabama State Court regarding the liquidation of ALIC. At the hearing a settlement (the "Pike Settlement") was reached by which Green Land Company[2] ("GLC") agreed to consent to the liquidation of ALIC, the Alabama Insurance Department agreed to transfer certain land and mortgages to the Alabama Life and Disability Guaranty Association (the "Guaranty Association"), and the Guaranty Association would negotiate in "good faith" with GLC and/or Burton Green regarding the sale of the fee interest in 13,676 acres of land (the "13,676 Acres") to be transferred to the Guaranty Association by the Alabama Insurance Department.

On November 13, 1994, John Crawley, counsel for GLC, filed a Motion for Immediate Hearing, requesting a hearing before the Alabama State Court to challenge the good faith of the Guaranty Association in negotiating for the sale of the fee interest in the 13,676 Acres. Thereafter, an Amended Motion for Immediate Hearing was filed.

A hearing on the Pike County motion was scheduled for December 14, 1994, in Enterprise, Alabama before Judge McAliley. The hearing was cancelled due to the illness of Burton Green. In the course of discussions on December 14th among representatives of the Guaranty Association, the receiver and Debtor, questions arose as to whether the Pike Settlement obligated the receiver to sell to the Guaranty Association certain mortgages owned by ALIC encumbering land owned in fee by Debtor. The receiver disputed that the Pike Settlement imposed any such obligation on the receiver.

During the course of those discussions in Enterprise on December 14th, representatives of GLC and/or Debtor inquired whether, if Debtor's plan were amended to provide for a one-year payout of the ALIC Secured Claims, the receiver would vote for the plan. The receiver replied that he would discuss the offer with his counsel, Tommy James.

---

1. Rule 11 is made applicable by Fed.R.Bankr.P. 9011.

2. The Green Land Company owns all of the outstanding stock of Debtor and eighty-three percent of the outstanding stock of ALIC.

On December 27, 1994, the receiver delivered a letter to Debtor advising Debtor that, after consultation with Mr. James, the receiver had decided not to change his vote.

On December 29, 1994, a telephone conference hearing was conducted by Judge McAliley. In addition to Judge McAliley, participants in the call were Mr. Crawley (on behalf of Green Land Company), Wes Boyer (on behalf of Debtor), Burton Green (Debtor's principal), Vicki McPherson (an employee of Debtor), and two attorneys for the Guaranty Association, Bill Patty and James Anderson (Patty and Anderson on behalf of the receiver). Aetna has claimed that Mr. Crawley appeared at the instigation of Debtor.

At the outset of the call, Judge McAliley announced that the issue to be decided was whether the receiver had acted in good faith in refusing to vote for Debtor's plan. Before this Court, Aetna complained that neither Mr. Patty nor the receiver received prior notice that such a hearing would take place. When Mr. Patty was patched into the call, he had no understanding of why the call had been convened. Aetna alleged that Judge McAliley stated, "This is what I understand the issue is going to be today." There apparently was no agreement by the parties at the beginning of the call that the issue announced by Judge McAliley was the issue to be resolved.

The conference call was originated by Mr. Crawley and was billed to Burton Green, who accepted charges for the call. The call originated from the telephone number of Judge McAliley in Enterprise, Alabama. The call originated at 11:05 a.m. and was not normalized until 11:23 a.m., meaning that, until 11:23 a.m., the parties on the call could not talk to one another. Mr. Patty was the last party added to the call at 11:22 a.m. The telephone hearing lasted twenty-three minutes, terminating at 11:46 a.m.

Following the telephone hearing, on December 29, 1994, Judge McAliley issued an order (the "Pike County Order") ordering the receiver to vote in favor of Debtor's Plan Of Reorganization on the ground that the receiver had not exercised good faith as required by the Pike County Settlement.

Based on the above presentation, Aetna sought to have this Court in effect reverse or nullify the vote of ALIC as ordered by the Alabama State Court. Aetna alleged that Mr. Crawley and the state court judge engaged in improper ex parte communications and bad faith and, as for the judge, judicial misconduct in allowing himself to be improperly influenced. As previously indicated, this Court declined to designate ALIC's vote finding the evidence presented by Aetna to be unconvincing and capable of several different explanations, only one of which would implicate the alleged misconduct on the part of the state court judge and Debtor.

### CONCLUSIONS OF LAW

Bankruptcy Rule 9011 governs an attorney's obligations to verify the facts and legal arguments in documents presented to the Court for consideration. Rule 9011 provides:

Rule 9011. SIGNING AND VERIFICATION OF PAPERS

(a) Signature. Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. *The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case.* If a document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the person whose

signature is required. If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

(b) Verification. Except as otherwise specifically provided by these rules, papers filed in a case under the Code need not be verified. Whenever verification is required by these rules, an unsworn declaration as provided in 28 U.S.C. § 1746 satisfies the requirement of verification.

(c) Copies of Signed or Verified Papers. When these rules require copies of a signed or verified paper, it shall suffice if the original is signed or verified and the copies are conformed to the original.

Fed.R.Bankr.P. 9011 (West 1994) (emphasis added).

The Rule 9011 issue before the Court is the propriety of Aetna's allegations against Debtor and the other parties to the Alabama liquidation proceedings, including a state court judge. Aetna contended that Debtor orchestrated an ex parte conspiracy to obtain a vote from the insurance receiver which was favorable to Debtor's plan. Although Aetna attempted to level its allegations solely against Debtor, the fact that Aetna complains that the state court judge not only received ex parte communications, but also allowed himself to be influenced by such communications raises the specter of a conspiracy. Debtor alleges that Aetna proceeded with its contentions without the requisite "reasonable inquiry" into the facts of the case and that the contentions were brought in a bad faith effort to overturn the state court's order directing the receiver to vote in favor of Debtor's plan.

■ Although Aetna has withdrawn its allegations regarding misconduct in the state court from its request for findings of fact, it has steadfastly maintained that the misconduct occurred. The withdrawal of the allegations from the request for findings of fact has no effect upon the present motion for sanctions.[3] The relevant date to review documents filed with the Court under Rule 9011 is the date the documents were signed. *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Associated Contractors, Inc.,* 877 F.2d 938, 943 (11th Cir.1989).[4] Moreover, Aetna has not retreated from claims that illegal ex parte communications in fact took place and resulted in a ruling adverse to Aetna.

■ Aetna argued at the hearing held on this matter that the "chilly" reception it perceived from this Court during the hearings on the Motion To Designate prevented it from pursuing the allegations of misconduct or seeking to further substantiate its allegations. This representation is specious. Aetna may not call upon this Court to overturn the order of another court based on alleged misconduct and then later complain that the "chilly" reception it received based on a dearth of evidence provided a disincentive to obtain and offer evidence. If Aetna was aware of any evidence of misconduct it should have presented such evidence at the hearing. Aetna had a duty to perform its investigatory discovery prior to bringing the Motion To Designate.

■ There can be no doubt that the purpose of Aetna's Motion To Designate was to convince this Court to overturn the order of the state court. The real issue is whether the misconduct alleged by Aetna is so conclusory or the facts so unsubstantiated that they evidence bad faith or abusive litigation tactics on Aetna's part. *See e.g. Collins v. Walden,*

---

**3.** The safe harbor provisions contained in the 1993 amendments to Rule 11 Fed.R.Civ.P. were not incorporated into Rule 9011 Fed.R.Bankr.P. Nor has the Court been presented with any evidence that the safe harbor provisions of Rule 11 would be implicated had this case been subject to the Rules of Civil Procedure as opposed to the Rule of Bankruptcy Procedure.

**4.** Case law interpreting Rule 11 Fed.R.Civ.P. prior to the 1993 amendments is equally applicable to cases implicating Rule 9011 Fed.R.Bankr.P. *Canatella v. McClellan (In re Leone),* 50 F.3d 15 (9th Cir.1995); *Capital Factors, Inc. v. General Plastics Corp. (In re General Plastics Corp.),* 184 B.R. 996 (Bankr.S.D.Fla.1995).

834 F.2d 961 (11th Cir.1987). Aetna's "facts" relied upon before this Court attempt to paint a picture of a conspiratorial effort by Debtor, Judge McAliley, and counsel for Green Land Company to obtain a favorable vote on Debtor's plan. Aetna relies entirely upon four facts to support its allegations:

1) Debtor was desperate to obtain ALIC's vote in favor of its Chapter 11 plan.

2) Judge McAliley knew the issue to be addressed at the emergency telephone hearing although the issue had not been raised in previous pleadings before the court.

3) Mr. Crawley, appearing on behalf of Green Land Company, was not at a separate telephone number from Judge McAliley when the telephone conference was commenced.

4) The judge and Mr. Crawley were long time friends.

At the hearing on the Motion To Designate, the Court was not convinced that Aetna had shown that improper ex parte communications had occurred, or that any such communications influenced Judge McAliley's decision. Aetna chose to rely entirely upon circumstantial evidence which was capable of multiple interpretations and/or explanations. The Court could not find that the above assertions established ex parte communications and misconduct without making assumptions unwarranted by the evidence.

The Court will address the facts Aetna relies upon in turn. The contention that Debtor wished to obtain confirmation of its plan is nothing short of a truism. This Court is not likely to encounter any debtor who would go through the time and effort necessary to propose a plan and participate in an eleven day trial without wanting to obtain confirmation of the plan.

■ The fact that Judge McAliley knew the issue of the emergency telephone hearing prior to the receiver does not necessarily lead to the sinister conclusion urged by Aetna. Emergency hearings are not uncommon, and the fact that the judge was informed of the nature of the issue which movant wanted to urge at the hearing was not unusual. In fact most judges would require prior disclosure of the subject matter of an emergency telephone hearing. This fact does not mean that the judge necessarily received illegal ex parte communications, or that such alleged communications influenced his decision.

■ The fact that Mr. Crawley was not at a separate telephone number from the judge when the conference was initiated does not provide the Court with any guidance. Aetna urges that the evidence proves Mr. Crawley was in the judge's office or, at least, in the same building. Mr. Crawley's proximity to the judge is not persuasive as to an allegation of ex parte communications. There are as many different ways to engage in ex parte communications as there are means of communication. Ex parte communications are determined by the content of the communication, not the proximity of the judge and the party or the fact that some form of dialogue occurred. Nevertheless, Aetna contends that the fact that Mr. Crawley and the judge were in the same building and possibly the same office provides an opportunity for such illegal communications.

■ Lawyers and judges are cautioned to avoid the appearance of impropriety.[5] It might be concluded that Mr. Crawley and Judge McAliley failed to heed this important touchstone of propriety. This motion by Aetna is ample proof of the wisdom of this rule. Where Aetna fails is in the assumption that proof of the appearance is proof of the substance. In order to find that an ex parte communication took place, this Court would have to assume that Mr. Crawley and the judge conversed, and not merely regarding the issues to be addressed at the hearing, but also regarding the merits of Mr. Crawley's arguments. The record is entirely devoid of any evidence to this effect.

The Court considers significant the fact that Aetna made no effort to contact either Mr. Crawley or Judge McAliley in conjunc-

---

**5.** Both judges and lawyers are instructed by applicable codes of conduct to avoid even the appearance of impropriety. *See e.g. Guide to Judiciary Policies and Procedures,* Codes of Conduct for United States Judges and Judicial Employees, Canon 2, (Nov. 10, 1993); State Bar of Georgia Handbook, Code of Professional Responsibility, DR 7–110, DR 9–101 (1995).

tion with the Motion To Designate ALIC's vote. The opportunity existed for Aetna to obtain direct evidence of ex parte communications, and yet Aetna opted to rely upon scant circumstantial evidence. An investigation at the source of the alleged misconduct would have been appropriate and would have the potential of yielding the best evidence for Aetna to prove its case.

The Court finds that no reasonable person would expect the allegations brought by Aetna to be successful based on the evidence presented. However, whether a reasonable person would expect the argument to be successful does not appear to be the appropriate test in determining whether sanctions are appropriate under Rule 9011. Expectations of success are not the focus of this Court's inquiry, rather the Court must look to the degree of inquiry engaged by Aetna prior to making its allegations.

Contrary to Aetna's assertions, it is not free to make allegations as long as the allegations are supported by any evidence whatsoever. The evidence presented must be the result of a reasonable investigation into the law and facts of a case. *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). An attorney's conduct is measured against what a competent attorney would have believed after making a reasonable inquiry. *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2nd Cir.1985), *modified*, 821 F.2d 121 (2nd Cir.), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Although prudence would seem to require a higher standard when allegations are made against the integrity of a judicial officer, this Court has been unable to find any support for such a proposition. This Court looks to several cases of the Eleventh Circuit Court of Appeals for guidance in evaluating Aetna's conduct.

The case of *Collins v. Walden*, 834 F.2d 961 (11th Cir.1987) is instructive. In *Collins*, the plaintiff, Mr. Collins, had attempted to have a state court judge recused from hearing the plaintiff's divorce proceedings based on the judge's terminal illness. The motion to recuse was denied in state court, and the plaintiff filed an action in federal court. The plaintiff alleged that Mrs. Collins and the judge had engaged in a conspiracy to deprive him of constitutional rights by denying the recusal. This first case was dismissed by the district court for failure to state a claim. *Id.* at 963.

Mr. Collins then filed another action in federal court alleging essentially the same facts, but substituting different defendants in his conspiracy allegations. The district court found that none of the supposed conspirators were connected with the state court proceedings, and granted summary judgment in favor of the defendants. The district court thereafter ordered Mr. Collins and his counsel to pay the defendants attorney's fees pursuant to 42 U.S.C. § 1988 and Rule 11. *Id.* at 963.

The Eleventh Circuit affirmed the district court's award of sanctions, not based on the parties conduct in the first case, which was dismissed, but rather on the second case which was filed alleging the same facts as the first case. *Id.* at 964. The circuit noted that the second case filed by Mr. Collins was merely a conclusory allegation inappropriate to the seriousness of the conspiracy claims. *Id.* at 964. The court stated:

> Conspiracy is a serious allegation, capable of sweeping any number of individuals, innocent as well as culpable, into its net for the duration of a potentially protracted litigation. Even if it presents the only theory which a creative attorney can devise to clear the numerous legal hurdles to stating a valid section 1983 claim, it is not to be invoked lightly.

*Id.* at 964.[6]

Pertinent to the present case, Mr. Collins relied upon phone calls to and from the judge's chambers as evidence of the alleged misconduct. The circuit court found that it

6. In a footnote, the court stated that allegations such as those addressed in *Collins* must be strictly scrutinized by the court. *Id.* at 964, n. 3. It is somewhat unclear which aspect of the *Collins* case called for strict scrutiny. This court interprets the Circuit's opinion as calling for stricter scrutiny whenever the court addresses cases which run high on emotions, such as divorce proceedings, rather than cases where a judge is accused of misconduct.

was not unusual for officers of the court to call and inquire regarding the health of the judge, and these calls were not evidence of a conspiracy. *Id.* at 965. Based on this sparse evidence as well as the fact that the previous case alleging the same facts had been dismissed, the circuit court found that sanctions were appropriate.

The *Collins* court contrasted the facts of its case to those of *Dykes v. Hosemann,* 743 F.2d 1488 (11th Cir.1984). In *Dykes,* the court addressed allegations of a conspiracy to deprive a party of constitutional rights on the part of several judges and parties involved in the litigation. The *Dykes* case dealt with a particularly contentious divorce and custody proceeding in which one of the judges involved was the father of the husband, who was also one of the alleged conspirators. That court found that there was enough evidence of a conspiracy so that the case should be submitted to a trier of fact. *Collins* at 965 (*citing Dykes* at 1498). The *Collins* court noted:

> Moreover, the facts of *Dykes* demonstrated a motive on the part of the alleged conspirators: the child whose custody was at issue was the grandchild of one of the alleged conspirators. A second alleged conspirator was his colleague, another state court judge of the same county, to whom the plaintiff's father-in-law had turned for advice. Under these facts, the court of appeals concluded that there was enough evidence to raise a reasonable inference of conspiratorial cooperation entitling the plaintiff to submit the conspiracy issue to the trier of fact....

> Accordingly, at the time Mr. Collins filed [the second case], he had neither direct nor circumstantial evidence of conspiracy sufficient to entitle him to reach a trier of fact. Additionally, Judge Forrester correctly noted that Mr. Collins had neither presented nor sought evidence that the judge had in fact been unduly influenced. What makes these deficiencies appear particularly egregious is the fact that the appellants had conducted more than ample discovery

in the course of [the first case] to know that they were not going to be able to prove the existence of a conspiracy.

*Id.* at 965.

By contrasting these two cases, the circuit court has provided examples of conduct which is sanctionable and that which is not. The present case falls somewhere in between the facts of *Collins* and *Dykes.* Aetna has alleged in conclusory fashion that a motive exists and that Judge McAliley and Mr. Crawley are friends. However, this bald assertion was unsupported by any direct evidence. At the time Aetna made its allegations, such contentions were supported by circumstantial evidence which was not present in *Collins.* On the other hand, Aetna has made no effort to present the testimony of Mr. Crawley or Judge McAliley by deposition, affidavit or otherwise. Like the plaintiff in *Collins,* Aetna has failed to substantiate its claims although it was possible to obtain additional evidence regarding the alleged cloak and dagger tactics of Debtor in the state court litigation. The amount of discovery Aetna undertook to present the circumstantial evidence before the Court belies any claims that Aetna lacked the time or resources to address the allegations of ex parte communications at the source.[7]

■■■ Nevertheless, the Court cannot find that Aetna's conduct was on a par with the plaintiff in *Collins,* although the similarities are disturbing. Aetna did in fact engage in discovery in order to present evidence of misconduct, and found evidence which it believed was supportive of its allegations. When evidence is capable of more than one interpretation it is the role of the trier of fact to determine if the evidence is sufficient to warrant any conclusion urged by the proponent. In this case, Aetna has failed by a wide margin, but not so wide as to say that the allegations were merely conclusory or patently filed in bad faith as a means to harass Debtor or defame the state court. For this reason, the Court will not impose sanctions. Further, the Court cannot find that counsels' conduct warrants disbarment.

---

7. Aetna issued a subpoena to AT & T requiring that a representative of the company appear in court accompanied by documents relating to the

details of the conference call. The live testimony of that representative was presented by Aetna.

Therefore, the Court also declines to revoke Hebb & Gitlin's *pro hac vice* practice privileges. *In re Evans*, 524 F.2d 1004, 1007 (5th Cir.1975).

▮ Members of the legal profession have an obligation not only to their clients, but also to the court and all of civilized society. What Debtor perceives as sanctionable, sadly, has become the state of affairs for many practitioners of this once-noble profession. So called "hardball" litigation may satisfy an attorney's duty to zealously represent his or her client, but it sometimes fails miserably to satisfy the lawyer's obligation to the community and his or her obligation to uphold the dignity of the profession. Issues of professionalism do not always rise to the level of ethical violations or sanctionable conduct. Instead, the failure of lawyers to subscribe to appropriate standards of professional conduct holds the legal profession up to public scorn and contempt. Such conduct leaves a tarnish which, if not contained, threatens to undermine further the standing of the profession and the judicial system we are sworn to uphold.

It has been said that four things belong to a judge:

To hear courteously

To answer wisely

To consider soberly

To decide impartially [8]

▮ The court in our society has the power to make things happen which would not otherwise occur except perhaps by force of arms.[9] The fundamental nature of the judicial function is the court's impartiality. Faith in this system of impartial justice is the cornerstone of our civilized society.[10] Where the law and justice diverge, the law becomes a tyranny, and justice a cry for revolution. For any government to retain its authority to govern, it must assure its citizens of its commitment to dispense justice with an even hand.[11] When the law ceases to become a vehicle for impartial justice it becomes a tool of oppression. Thus, it seems, Aetna fails to appreciate the seriousness of its allegations.

Mere accusations of bias or impropriety damage our faith in the legal system. When these accusations of misconduct are brought halfheartedly or as a litigation tactic, the state of the profession reaches an even lower ebb. When attorneys bring accusations challenging the impartiality of the court without pursuing every available evidentiary lead, our hopes for life and liberty in a nation of laws and not of men is diminished.[12]

It happens, maybe unfortunately, that the task of preserving and promoting this ideal falls principally to the lawyers of our land. Yet they are also charged with the duty of advocacy. If they are unable or unwilling to reconcile these dual responsibilities, the ideal

---

**8.** Catherine Therese Clarke, MISSED MANNERS IN COURTROOM DECORUM, 50 Md.L.Rev. 945, 1026, n. 285 (1991).

**9.** "In our country law is not a body of technicalities in the keeping of specialists or in the service of any special interest.... If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny. Legal process is an essential part of the democratic process. For legal process is subject to democratic control by defined, orderly ways which themselves are part of law. In a democracy, power implies responsibility." *United States v. United Mine Workers of America*, 330 U.S. 258, 312, 67 S.Ct. 677, 705, 91 L.Ed. 884 (1947) (Frankfurter, J., concurring). The power of the Court to render verdicts under the law depends upon the Court's adherence to its responsibility to administer the law impartially.

**10.** "Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake." *Sherman v. United States*, 356 U.S. 369, 380, 78 S.Ct. 819, 824, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring).

**11.** As the Supreme Court stated: "Such institutions may be destined to pass away. But it is the duty of the Court to be the last, not the first, to give them up." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655, 72 S.Ct. 863, 880, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

**12.** "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.... The government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162–63, 2 L.Ed. 60 (1803).

of justice under law may prove to be an impossible dream.

In sum, there is a fundamental discord created by Aetna's behavior in that counsel comes to this court seeking justice at the same time that counsel complains that the system cannot deliver on its promise. The seriousness of the accusations are not borne out by the way in which Aetna sought to prove them. While the Court finds that the circumstantial evidence provided by Aetna is the minimum necessary to escape sanctions or other deleterious repercussions, its conduct nonetheless does not speak well of a profession supposedly dedicated to the honorable pursuit of justice. Counsel should be mindful that in winning the legal battle, it is possible to lose the respect of those whose faith fuels our system.

Debtor's Motion For Sanctions And For Revocation Of Hebb & Gitlin's Permission To Practice Pro Hac Vice will be DENIED.

An order in accordance with this Memorandum Opinion will be entered this date.